**STATE of Minnesota, Respondent,**

v.

**Rusttee A. TORRES, Appellant.**

**No. C5–00–1603.**

Supreme Court of Minnesota.

Aug. 16, 2001.

WL 360595 at *3.

610

Ann McCaughan, Asst. State Public Defender, for appellant.

Michael Hatch, Attorney General, Peter R. Marker, Asst. Attorney General, G. Paul Beaumaster, Rice County Attorney, for respondent.

## OPINION

LANCASTER, Justice.

On June 15, 2000, a Rice County jury found appellant Rusttee Torres guilty of both murder in the first degree in the course of a burglary, in violation of Minn. Stat. § 609.185(3) (2000), and murder in the second degree, in violation of Minn. Stat. § 609.19, subd. 1(1) (2000), for his role in the death of Jesse Springer in Faribault, Minnesota, in the early morning hours of May 9, 1999. The jury found him not guilty of premeditated murder in the first degree, Minn.Stat. § 609.185(1) (2000). Shortly before closing arguments, the trial court refused Torres' request that the jury be instructed on the defense of voluntary intoxication. In this direct appeal, Torres alleges reversible error in the trial court's refusal to give the jury instruction. Torres also alleges here, for the first time, prosecutorial misconduct. We affirm.

The facts giving rise to Torres' conviction are as follows. In the early afternoon of May 8, 1999, Dylan Frohn and his friend Chris St. Martin drove from their home in Faribault to the Medford residence of Torres and his housemate Tracy Sailor. There Frohn related how, earlier in the day, he had been swindled out of $160 in a drug transaction with Trent Springer. The four men stayed at the house for a time, using illegal drugs, then drove back to Faribault in two vehicles. They dropped off Frohn's car at his house and spent the afternoon drinking alcohol and using drugs as they cruised the town in Torres' vehicle.

The men made a few attempts to locate Trent Springer and eventually learned which room he was renting at a local motel. By chance, they then encountered Springer in front of a Faribault liquor store, where Frohn and Springer had a brief altercation before Springer left. Jesse Springer, Trent's younger brother, also happened to be at the liquor store but did not participate in the altercation.

The four men purchased beer from the liquor store and continued to cruise Faribault, drinking and using drugs, until returning to Torres' residence in Medford at approximately 8:00 p.m. From there, they drove to a bowling alley in Waseca and then returned to Torres' residence where they remained for an hour or more. Sometime after midnight, they returned to Faribault and went to Frohn's home. During their travels and their time at Tor-

res' residence, they continued to consume beer and drugs.

While at Frohn's home, the four men drank and put on gloves in preparation for a fight with Springer. They then left to find Springer, now traveling in Frohn's mother's van. Torres left behind, in the trunk of his vehicle, the nine-millimeter handgun he had been carrying. Frohn took along a .38 handgun he had gotten from Torres earlier in the day. The four men drove to the motel where they believed Springer was staying and knocked on the door to his room. There was no answer and the men left. Frohn drove the men to Jesse Springer's apartment, where they hoped either to find Trent Springer or to "rattle [Jesse's] cage" to make Jesse tell them where to find his brother. Frohn drove past Jesse's apartment and parked a block up the street so that the van would not be seen by anyone in the apartment. St. Martin was very intoxicated. He stayed in the van while the other three went to Jesse's apartment door.

Frohn knocked on the door to Jesse Springer's apartment and identified himself. As Jesse opened the door, he told Frohn that Trent was not there. Sailor rushed in, pushing Frohn into the apartment. Torres followed Frohn and Sailor into the apartment. Jesse told them to get out of his apartment and that his brother did not live there. As Jesse finished speaking, Sailor grabbed Jesse by the throat and pinned him against a wall. Torres then held the .38 handgun on Jesse in the living room next to a couch while Frohn and Sailor searched the apartment for Trent. They did not find him. At some point Frohn took one of Jesse's music CDs.

The three men gave different accounts of Jesse Springer's death. At trial, Sailor testified that he heard a gurgling sound as he re-entered the living room from his search of the rest of the apartment. Sailor did not know where Frohn was at that time, but upon re-entering the living room, he saw Torres stab Jesse in the back with a knife as Jesse lay face down on the couch. Torres told him to cover Jesse's body with a blanket, and the three men then left the apartment, Frohn locking the door. Frohn testified that after the apartment search, Torres told him to go into the kitchen while Torres asked Jesse some questions. Shortly thereafter he heard a choking or gurgling sound, then Sailor and Torres came through the kitchen and told Frohn to lock the door behind him as they all exited. The police officers who interviewed Torres in the early morning hours of May 11, 1999, testified that Torres told them that Frohn killed Jesse, slashing his throat with a knife as Jesse sat on his couch facing all three of the intruders.

The four men then drove back to Medford in Frohn's mother's van. As they traveled, Torres handed Sailor, who was sitting in the front passenger seat, a knife and sheath and told him to throw them out the window into the farm fields they were passing. The four men agreed on an alibi story: they had remained in Medford together that night and never made their final trip into Faribault. After the four men returned to Torres' residence, Sailor and Torres washed their clothes and Frohn and St. Martin scrubbed Sailor's and Torres' shoes and laces. Over the next 24 hours, Sailor and Frohn attempted, with varying degrees of success, to dispose of the shoes and gloves the three had worn the previous night; Sailor also disposed of a hat he had worn.

Jesse Springer's body was discovered in the mid-afternoon of May 9. His body was face down on the couch, under a blanket. His throat had been slashed with a knife, almost from ear to ear, severing his right carotid artery and jugular vein, and he had

been stabbed several times in the back. The wounds had been inflicted with a knife. The next day, May 10, St. Martin told the police what he knew about the events of the night of May 8–9. Frohn, Sailor, and Torres were questioned by the police on the night of May 10–11. The police found the knife sheath Sailor had tossed from Frohn's mother's van and two pairs of shoes Sailor had attempted to discard.

Torres was indicted for first-degree premeditated murder, first-degree felony murder during commission of a burglary, and intentional second-degree murder. Frohn and Sailor agreed to testify truthfully at Torres' trial in exchange for being allowed to plead guilty to second-degree felony murder.

At trial, the state presented testimony from St. Martin, Frohn, and Sailor; evidence that blood had been found on the clothes allegedly worn by Torres and Sailor at the time of the murder; and evidence that one of the shoes recovered contained DNA most compatible with Jesse Springer among the principals of the case. Both a blood-spatter expert and the medical examiner testified that Torres' description of how Frohn had slashed Jesse's throat was unlikely and that instead Springer was probably lying face down on the couch when his throat was cut and when he was stabbed in the back.

Pursuant to Minn. R.Crim. P. 9.02, subd. 1(3)(a), defense counsel had notified both the prosecution and the court well before trial that Torres intended to rely on an intoxication defense at trial. During a series of motion hearings a few weeks before trial, defense counsel reiterated that Torres intended to use the defenses of intoxication and not guilty. Two days later, during jury voir dire, the prosecution

asked jurors a question that defense counsel paraphrased, in argument to the trial court, as follows:[1] "[D]o you think people that are drunk and do something bad should be held responsible for what happens[?]" In anticipation of a possible jury instruction regarding intoxication, defense counsel argued that the prosecution's question was "misleading about what the law says and what can be used as a defense in this particular case."

Defense counsel's opening statement referred to the four men's drug and alcohol consumption in the time preceding their visit to Jesse Springer's apartment:

> [A]fter they get done at the Bottle Shop they begin consuming alcohol. You will hear from all of them that they drank beer, they smoked pot and they did a large amount of [c]ocaine. You'll hear details from each one of them about how much they did and how intoxicated they were.

Each of St. Martin, Frohn, and Sailor testified at trial regarding the quantity and type of drugs and alcohol the group consumed on the afternoon and night of May 8–9. Their testimony was in essential agreement that the four men all used cocaine before they left Medford on the afternoon of May 8 and that they all drank, smoked marijuana, and used cocaine throughout that afternoon, evening, and night.

St. Martin stated that he had seven or eight beers throughout the day, that his level of intoxication was the equivalent of "two times the legal limit," and that the admixture of marijuana heightened the effect of the alcohol. St. Martin stated that he also snorted five or six lines of cocaine, and described the effect of adding this amount of cocaine to the alcohol/marijuana mix as creating "[a] wired drunk." He

---

**1.** The record before us does not contain a transcript of voir dire.

testified that when the group was at Frohn's house in the early hours of May 9, he was "getting pretty messed up" and that by the time they parked near Jesse's apartment, he was "totally screwed out of [his] gourd." When the others went to the apartment, St. Martin remained in the van "watching the world spin."

St. Martin testified that Torres and Sailor "usually did like two lines [for every one that St. Martin did] because they were, like, more, like, immune to it because they had it all the time." St. Martin stopped taking cocaine upon the group's return to Medford from Waseca, but the other three used more cocaine at that point. St. Martin testified that he had no idea how much beer Torres drank.

Frohn estimated that he drank 10 to 20 beers throughout the day, smoked some marijuana, and used two to six lines of cocaine. When asked to describe how intoxicated he was at the time the three men were in Jesse Springer's apartment, Frohn said he was "a little drunk" or "sober enough to know what was going on but * * * still drunk." When asked if Sailor and Torres did more cocaine than he did, Frohn answered: "Well, as far as I know, yeah, but, I don't know for sure."

Sailor testified that as a group the four used two or three grams of cocaine and that he and Torres might have done more cocaine than the other two, but that he did not know. Sailor also stated that the group drank about a case and a half of beer and that the four drank equal shares of the beer. The prosecutor asked him about the condition of the four men during their stop at Frohn's in the early hours of May 9, before the murder: "You guys were pretty loaded at this point?" Sailor agreed: "Oh, yeah."

Sailor described his own attitude at the time the four of them knocked on Trent Springer's door at the motel as "pumped up" and Torres' attitude as "the attitude he always has," that is, "under control, just cool, calm." He described himself, while in Jesse Springer's apartment shortly thereafter, as "all drunk and doped up." He stated that he didn't know if he was intoxicated later, back in Medford, and added, "I think I was probably coming down."

Torres did not testify at trial, but the prosecution played into evidence a tape of his initial interrogation by the police on May 11, 1999. During the taped portion of his interrogation by the police, Torres described his own use of alcohol and drugs on the night of May 8–9. His statements regarding his and the others' consumption of drugs and alcohol prior to 8:00 p.m. agree generally with the testimony of the other three men. However, at the same time, Torres claimed that he did not leave Medford after returning from Waseca and denied ever being at Jesse Springer's apartment, saying that he remained in the car when the others visited Jesse on the afternoon or early evening of May 8. When pressed on the timing for his version of events, Torres stated: "I don't remember * * *. I was all * * * coked up." Torres agreed when asked if the reason he couldn't remember the night of May 8–9 was because he was "coked up" and drinking.

Immediately after Torres made this statement, the police officers questioning Torres told him that they knew he was at Jesse Springer's apartment on the night in question. Torres then acknowledged that he was at the apartment. When the officers told him that they knew that at least one of Frohn, Sailor, or Torres had cut Jesse Springer's throat, Torres told the officers that he would talk to them if they turned off the tape recorders. The officers testified at trial that, off tape, Torres explained and demonstrated how Frohn

had slashed Springer's throat. During this portion of his interview, Torres did not make any further reference to his consumption of intoxicants or any impairment he might have suffered because of such consumption.

After both sides had rested, but before closing arguments, the trial court denied Torres' request that the jury be instructed on voluntary intoxication.[2] Torres objected to that decision. The trial court, in denying the requested instruction, stated that the "hole" in the argument for an instruction was that there was no testimony that Torres seemed to anyone else to be "drunk, intoxicated, or unable." Defense counsel replied that testimony from Frohn, Sailor, and St. Martin as to Torres' extensive use of intoxicants confirmed, to an extent sufficient to warrant a jury instruction, Torres' own statement that he was "all coked up" and unable to remember. The prosecutor argued that Torres made this statement in the context of his statement that he had remained in Medford after returning from Waseca, and that Torres then moved on to a different story (that Frohn had killed Springer), which he was able to relate to the police with great clarity. Defense counsel replied that the prosecutor could make that argument to the jury, but as Torres had asserted his incapacity, it was for the jury to decide the truth of Torres' statements and whether he was incapacitated. The court then stated:

> It seems to me [that a defendant] is entitled to [an intoxication instruction] * * * when the defendant asserts his intoxication as a[n] explanation for what happened. The, the other way to look at that, I think, is * * * the defendant has the burden of both going forward, to raise the intoxication defense, * * * and then has the burden of persuasion to the jury by a preponderance of the evidence.

> I don't believe in this case the Defendant has gone forward with evidence to support the intoxication defense. * * * [I]f we look at that statement it was, "I was all coked up, I was drunk, I was passed out in Medford." Right after that he then says, "Turn off the tape," and there is a different statement that says, yeah, I really was at the scene and Mr. Frohn committed the act.

> * * * I don't think in these circumstances that statement is sufficient to meet his burden of going forward with the intoxication defense.

**2.** Minnesota Statutes § 609.075 (2000) establishes voluntary intoxication as a consideration in determining whether the specific intent element of a crime is met:

> An act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind.

*Id.* The standard jury instruction regarding voluntary intoxication states:

> It is not a defense to a crime that the defendant was intoxicated at the time of the act if the defendant voluntarily became intoxicated. However, if it is an element of a crime that the defendant had a particular intent, you should consider whether the defendant was intoxicated, and if so, whether the defendant was capable of forming the required intent. The burden of establishing intoxication is on the defendant. The defendant must prove the claim of intoxication by the greater weight of the evidence. * * *

> However, the State must prove beyond a reasonable doubt that the defendant had the required intent.

10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 7.03 (4th ed.1999); *see also State v. Pilcher,* 472 N.W.2d 327, 337 (Minn.1991) (encouraging the use of this instruction over other instruction language).

The court stated that St. Martin was the only one of the four men to say that he himself was drunk and that there was no testimony that Torres was intoxicated: "[I]n fact, the only thing I could find was Tracy Sailor's testimony, exactly to the contrary, that he was cool, calm and had the same attitude he always had. So, based on that I'm going to deny the request." The court went on to state that the instruction "really doesn't say very much" and invited defense counsel to argue that the state had not proved its case as to intent because Torres was too intoxicated to have formed the requisite intent.[3] The trial court's instruction to the jury regarding intent was:

> In order to find the Defendant had an intent to kill, you must find the Defendant acted with the purpose of causing the death, or believed that the act would have that result. Intent, being a process of the mind, is not always susceptible to proof by direct evidence, but may[ ]be inferred from all of the circumstances surrounding the event. For this count it is not necessary that Defendant's act be premeditated.

The jury acquitted Torres of premeditated murder but found him guilty of both first-degree felony murder and second-degree murder.

## I.

■■■ We review a trial court's refusal to issue a requested instruction for abuse of discretion, focusing on whether the refusal resulted in error. *State v. Kuhnau*, 622 N.W.2d 552, 555 (Minn.2001). "It is beyond dispute that a party is entitled to an instruction on his theory of the case if there is evidence to support it." *State v. Ruud*, 259 N.W.2d 567, 578 (Minn.1977). "If the crime charged has a specific intent

as an element and if intoxication is offered by the defendant as an explanation for his actions, then the court must give an instruction on intoxication." *State v. Lindahl*, 309 N.W.2d 763, 766 (Minn.1981). Therefore, to receive a requested voluntary intoxication jury instruction: (1) the defendant must be charged with a specific-intent crime; (2) there must be evidence sufficient to support a jury finding, by a preponderance of the evidence, that the defendant was intoxicated; and (3) the defendant must offer intoxication as an explanation for his actions.

■■■ The first of these requirements is met; the crimes with which Torres was charged are specific-intent crimes. As to the second requirement, there can be reasonable disagreement as to whether the evidence is sufficient to support a jury finding by a preponderance of the evidence that Torres was intoxicated. Because we find the third requirement determinative of this case, we need not decide whether the second requirement is met. Indeed, we assume for purposes of argument that the evidence was sufficient to support a jury finding that Torres was intoxicated. We turn our attention to whether Torres offered intoxication as an explanation for his actions.

Torres' evident defense at trial was that Frohn killed Jesse Springer. That defense did not preclude Torres from offering the alternative defense of intoxication. He argues on appeal that he did offer evidence on this alternate theory. Specifically, Torres argues that his statement to the police that he was "all * * * coked up" and couldn't remember the late night events of May 8–9 constitutes an offer of intoxication as an explanation for his actions. We agree with the trial court, how-

---

**3.** Defense counsel did argue in closing to the jury that they should consider whether Tor-

res' use of drugs and alcohol showed that he had formed no premeditation or intent.

ever, that it is significant that this statement by Torres was made at the time he was maintaining that he was not at Jesse Springer's apartment at all on the night of May 8–9. When, during that same interview, Torres abandoned the attempt to convince officers that he was somewhere else entirely during the murder and admitted that he had been present when Springer was killed, he described the actions of all participants lucidly and precisely, without any reference to his own intoxication. We therefore conclude that the trial court was within its discretion when it found that Torres had not offered intoxication as an explanation for his actions.

■■ Torres argues that the jury instruction is mandated even in the absence of an explicit offer, through either evidence or argument, of intoxication as an explanation for his actions. A defendant's consumption of intoxicants does not create a presumption of intoxication and the possibility of intoxication does not create the presumption that a defendant is thereby rendered incapable of intending to do a certain act. *State v. Lopez*, 587 N.W.2d 26, 28–29 (Minn.1998). Nevertheless, it may be that there is some point at which evidence of a defendant's intoxication, whether by consumption of intoxicants alone or in combination with other evidence, is so overwhelming as to constitute the effective offer of intoxication as an explanation for the defendant's actions. *See State v. Peterson*, 262 N.W.2d 706, 707 (Minn.1978) (affirming a trial court's refusal to instruct the jury on the defense of voluntary intoxication "because defendant did not offer drinking as an explanation for his actions and the other evidence was not such as to mandate the submission of the defense"). We must consider whether, in this case, the evidence of consumption so strongly makes the case for the voluntary intoxication defense as to constitute an offer of intoxication as an explanation for Torres' actions. We conclude that it does not.

In addition to the copious evidence of consumption, we must also consider Sailor's testimony that Torres was "under control" and "calm" shortly before the murder, which tends to show Torres was not intoxicated. *See Lopez*, 587 N.W.2d at 29 (upholding trial court's refusal to instruct on the intoxication defense where the only direct evidence regarding whether the defendant appeared intoxicated was testimony from a physician's assistant who treated the defendant several hours before the crime that he did not note or recall any evidence of alcohol or drug use by the defendant). We note that even in cases where the defendants presented strong evidence of consumption of large amounts of intoxicants, we have upheld convictions against defendants' claims that their intoxication required a finding of reasonable doubt. *E.g.*, *State v. Olson*, 298 Minn. 551, 552–53, 214 N.W.2d 777, 778 (1974) (per curiam) (concluding that a blood alcohol content of .29 approximately one hour after events of crime did not compel finding that defendant in an assault case could not possibly have intended his actions). We conclude that Torres did not offer intoxication as an explanation for his actions. Thus the trial court did not abuse its discretion by declining to instruct the jury on the voluntary intoxication defense.

II.

■ Torres also alleges for the first time, on appeal before this court, that the prosecutor in his trial committed misconduct and that this misconduct was of a degree sufficient to warrant a new trial. Where a defendant fails to object to a prosecutor's statements or request curative instructions, the defendant is deemed to have waived the right to appeal on the

basis of those statements. *State v. Parker*, 353 N.W.2d 122, 127 (Minn.1984). If the prosecutor's comments are unduly prejudicial, however, this court may choose to reverse a conviction despite the defendant's failure to object. *Id.* at 127–28. To grant a new trial for serious misconduct, this court must determine that the misconduct was not harmless beyond a reasonable doubt. *State v. Boitnott*, 443 N.W.2d 527, 534 (Minn.1989). A fair review of the record convinces us that there was no misconduct in this case that comes close to meeting this standard. *Cf. State v. Porter*, 526 N.W.2d 359, 364–66 (Minn.1995) (granting new trial on the basis that the cumulative effect of prosecutor's intentional and serious misconduct was an attack on juror independence).

 Torres alleges, first, that the prosecutor committed misconduct by improperly attempting to inflame the jury in both the opening statement and the closing argument. In the opening statement, the prosecutor told the jury that they were "going to hear about a cold blooded killing with the death gasp of Jesse Springer" and that "Jesse Springer was * * * slaughtered, quite literally, butchered alive." In the closing argument, the prosecutor once again referred to Jesse Springer as having been "slaughtered alive." We note that the prosecutor's language hews to the settled definitions of "butcher" and "slaughter"[4] and we consider these phrases forceful yet apt descriptions of the manner in which Jesse Springer was killed. The use of these phrases was not prosecutorial misconduct.

 Torres also alleges that the prosecutor's closing argument misstated the evidence that had been presented to the jury during the trial. In particular, Torres points to the prosecutor's statements that Torres: (1) told Frohn, "[W]e'll get your money back"; (2) took an active role in covering up and destroying evidence of the crime after his return to Medford; and (3) left his nine-millimeter handgun in the trunk of his car because it was a nice gun that he would not want to discard after committing a crime. St. Martin did indeed testify at trial that Torres told Frohn, "We'll get the money back." There was also testimony that Torres participated in the destruction of evidence. Any misstatement on the prosecutor's part with respect to Torres' decision to leave his nine-millimeter handgun in his car when he left Frohn's house could only go to prove premeditated murder, of which Torres was acquitted and is, therefore, harmless beyond a reasonable doubt.

Finally, we address an incident that occurred between counsel before trial. The assistant county attorney who second-chaired this case, during a recess in a pretrial hearing, displayed a marked lack of maturity and civility when he "yell[ed] at" defense counsel (defense counsel's words) in a public corridor of the courthouse, "Read the case, moron." This incident disturbs us greatly; there is no place for such conduct in the legal profession. The Professionalism Aspirations recently adopted by this court state that all lawyers are to treat their colleagues "in a civil and courteous manner, not only in court, but also in all other written and oral communications," Minn. Prof'l Aspirations III.A.1, and are to "abstain from disparaging personal remarks or acrimony toward other counsel," *id.* at III.A.2. As the assistant county attorney's on-the-record explana-

---

**4.** *The American Heritage Dictionary of the English Language* (3d ed.1992) defines the verb "butcher" to mean: "To kill brutally or indiscriminately." *Id.* at 261. This same dictionary offers among the definitions of the verb "slaughter": "To kill in a violent or brutal manner." *Id.* at 1694.

tion and apology reveals, his remark was made in the heat of battle and was borne of frustration with defense counsel. We join in the trial court's disapproval of the assistant county attorney's behavior and commend the trial court for refusing "to tolerate that kind of conduct or those kind of statements."

For the reasons discussed above, we hold that the trial court did not abuse its discretion by declining to instruct the jury on the voluntary intoxication defense and that there was no prosecutorial misconduct warranting a new trial for the defendant.

Affirmed.

PAGE, Justice (concurring specially).

I concur in the result reached by the court. I disagree, however, with the court's interpretation of what it means for a criminal defendant to "offer intoxication as an explanation for his actions." Implicit in the court's interpretation is the requirement that, before the trial court is required to instruct the jury on the intoxication defense, a defendant not only must raise, but must *establish,* his intoxication. This requirement reads Minn.Stat. § 609.075 (2000) out of the law.

In *State v. Lopez,* we stated:

Before the intoxication defense comes into play, a defendant must offer intoxication as an explanation for his actions. "The mere fact of a person's drinking does not create a presumption of intoxication, and the possibility of intoxication does not create the presumption that a person is rendered incapable of intending to do a certain act." Put another way, a defendant cannot offer intoxication as an explanation for his action solely by introducing evidence that he may have been drinking.

587 N.W.2d 26, 28–29 (Minn.1998) (quoting *State v. Lund,* 277 Minn. 90, 92, 151 N.W.2d 769, 771 (1967)) (footnotes omitted). While *Lopez* requires something more than "introducing evidence that he may have been drinking," surely something less than *establishing* intoxication is sufficient. Although we have never indicated the quantum or type of evidence sufficient to offer intoxication as an explanation for a defendant's conduct, the court acknowledges that at some point evidence of consumption is so overwhelming that it may, by itself, require that a requested intoxication instruction be given. The court concludes that such a point is not reached in this case. On the record before us, I believe the court is wrong.

The evidence presented at trial supports the following facts regarding Torres' consumption of drugs and alcohol in the 12 hours preceding Jesse Springer's murder: he drank approximately nine beers, smoked an undetermined quantity of marijuana, and snorted 10 to 12 lines of cocaine. Regardless of the specific amounts, St. Martin, Sailor, and Frohn all testified that Torres consumed roughly as many drugs and as much alcohol as they did. Each of these witnesses also testified about his resulting level of intoxication and the impact it had on him. St. Martin testified that, shortly before the crime, he was "getting pretty messed up." Sailor described himself at that same time as "pretty loaded." When they arrived at Jesse Springer's apartment, St. Martin was, by his own admission, "totally screwed out of [his] gourd," so much so that he remained behind in the van "watching the world spin" when the others entered the apartment. Sailor testified that, when he was in Jesse Springer's apartment, he was "all drunk and doped up." Frohn stated that, while he was in the apartment he was "a little drunk" or "sober enough to know what was going on but * * * still drunk." Had they been on trial, testifying about their consumption,

would they not have been entitled to the intoxication instruction? Had Torres taken the stand and testified that he had consumed the amounts and types of intoxicants that St. Martin, Frohn, and Sailor testified that they had consumed, would he not have been entitled to the intoxication instruction? One is left to ask: If the evidence in this case is not sufficient to warrant a jury instruction on intoxication, what quantum and type of evidence would suffice?

The court relies on Tracy Sailor's testimony that shortly before the murder Torres was "under control" and "calm" as support for its conclusion that Torres did not offer intoxication as an explanation for his conduct. In doing so, the court ignores the testimony of St. Martin, Frohn, and even Sailor, regarding Torres' consumption of drugs and alcohol preceding the murder. The court's reliance on Sailor's statements that Torres was "under control" and "calm" preceding Jesse Springer's murder also fails to take into account that Sailor was "pretty loaded" and "all drunk and doped up" at the time he was observing Torres' demeanor. Sailor's consumption of drugs and alcohol makes his observations regarding Torres' demeanor suspect. The court cites Lopez, 587 N.W.2d at 29, to support the weight it accords Sailor's testimony regarding Torres' demeanor. Lopez is distinguishable. In Lopez, the observer relied on was a physician's assistant who treated Lopez a few hours before Lopez's offense. Clearly, the observations of a treating health-care professional as to the subject's intoxication are more credible than observations of an accomplice who is himself admittedly "pretty loaded." Further, and importantly, the facts regarding consumption of intoxicating substances in Lopez are vastly different from the instant case. In Lopez, while there was testimony that the group of people that the defendant was with be-

fore the shooting had been drinking beer and smoking marijuana and that the defendant "may" have done some of the drinking, there was no testimony or other evidence presented as to the quantity of beer he may have consumed, nor was there testimony or other evidence suggesting that he used any marijuana.

The result of the court's reasoning is that, short of establishing their actual intoxication, defendants will not be able to make a showing that will require the trial court to issue the requested jury instruction. Without such an instruction, Minn. Stat. § 609.075 is an empty space in the statute books. The legislature could not have intended this result. See Minn.Stat. § 645.16 (2000) ("The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature. Every law shall be construed, if possible, to give effect to all its provisions."); Firstar Corp. v. Comm'r of Revenue, 575 N.W.2d 835, 840 (Minn.1998) (declining to construe statute in such a way as to render it meaningless).

A request for an instruction on voluntary intoxication is to be granted whenever there is sufficient evidence to support a finding of intoxication, not only when the defendant has proved intoxication to the satisfaction of the court. "It is beyond dispute that a party is entitled to an instruction on his theory of the case if there is evidence to support it." State v. Ruud, 259 N.W.2d 567, 578 (Minn.1977). On the evidence presented at this trial, Torres was entitled to have the jury instructed that it "should consider whether the defendant was intoxicated, and if so, whether the defendant was capable of forming the required intent." 10 Minn. Dist. Judges Ass'n, Minnesota Practice—Jury Instruction Guides, Criminal, CRIMJIG 7.03 (4th ed.1999). Torres should have been allowed to present his defense to the jury

and it was an abuse of discretion for the trial court to refuse the requested instruction. Having stated this, I concur in the judgment of the court because I also believe that, on the record presented, the court's error was harmless beyond a reasonable doubt. *See State v. Kuhnau,* 622 N.W.2d 552, 558 (Minn.2001) (noting that error in jury instructions may not require a new trial if error is harmless); *State v. Juarez,* 572 N.W.2d 286, 291 (Minn.1997) (clarifying the standard for harmless error in Minnesota).

BLATZ, Chief Judge (concurring specially).

I join in the special concurrence of Justice Page.