**Rusttee Allan TORRES, petitioner, Appellant,**

v.

**STATE of Minnesota, Respondent.**

**No. A12–0570.**

Supreme Court of Minnesota.

Oct. 2, 2013.

---

Rusttee A. Torres, Bayport, Minnesota, pro se.

Lori Swanson, Attorney General, Saint Paul, Minnesota; and G. Paul Beaumaster, Rice County Attorney, Benjamin Bejar, Assistant County Attorney, Faribault, Minnesota, for respondent.

## OPINION

WRIGHT, Justice.

In his second postconviction petition, Rusttee Allan Torres seeks relief from his conviction of first-degree murder in the course of a burglary, arising out of the death of J.S. Torres alleges that he is entitled to a new trial based on newly discovered evidence. The postconviction court denied Torres's petition after an evidentiary hearing, and we affirm.

On May 8, 1999, Dylan Frohn and Chris St. Martin drove from Faribault to a home in Medford that Torres shared with Tracy Sailor.[1] Frohn told Torres, Sailor, and St.

---

1. Because the facts surrounding the death of J.S. are set forth in detail in *State v. Torres,* 632 N.W.2d 609 (Minn.2001), we limit the

Martin that, during a drug transaction earlier that day, T.S. had swindled Frohn out of $160. The four men drove from Medford to Faribault and spent the afternoon drinking alcohol, using drugs, and looking for T.S. while they drove around Faribault in Torres's vehicle. They found T.S. and his younger brother, J.S., in front of a liquor store. After an altercation between Frohn and T.S., the men continued using drugs and alcohol while driving from Faribault to Medford and back.

Torres, Sailor, St. Martin, and Frohn eventually arrived at Frohn's home in Faribault, where they put on gloves in preparation for a fight with T.S. They next traveled to a hotel where they thought T.S. was staying. But they did not find him there. Frohn later drove the group to J.S.'s apartment where they hoped either to find T.S. or to "rattle [J.S.'s] cage" in an effort to make J.S. disclose T.S.'s whereabouts. St. Martin, who was heavily intoxicated, remained in the vehicle while Torres, Frohn, and Sailor went to J.S.'s apartment. Frohn knocked on the door. When J.S. opened the door, Sailor rushed in, pushing Frohn into the apartment. Torres followed. Sailor grabbed J.S. by the throat and pinned him against a wall. While Frohn and Sailor searched the apartment for T.S., Torres held J.S. at gunpoint in the living room. Shortly thereafter, J.S. was killed, and the three men fled the apartment. J.S.'s friends discovered his body lying face down on the living room sofa. His throat had been slashed with a knife, and he had been stabbed several times in the back.

Following an investigation, Torres was charged by indictment with first-degree premeditated murder, first-degree felony murder during the commission of a burglary, and second-degree intentional murder. In exchange for their agreement to testify at Torres's trial, Frohn and Sailor pleaded guilty to second-degree felony murder. Sailor testified that, after completing his search of the apartment, he heard a gurgling sound as he entered the living room. There, he observed Torres stab J.S. in the back with a knife as J.S. lay face down on the couch.

According to Frohn's testimony, he searched the apartment, after which Torres told him to go into the kitchen while Torres asked J.S. some questions. Frohn complied and heard a choking or gurgling sound shortly thereafter. Sailor and Torres subsequently entered the kitchen and directed Frohn to lock the door behind them as they left the apartment. Although Torres did not testify at trial, the officers that interviewed him testified that Torres said he saw Frohn kill J.S.

The jury found Torres guilty of first-degree felony murder and second-degree intentional murder; he was acquitted of first-degree premeditated murder. After adjudging Torres guilty of first-degree felony murder, the district court imposed a sentence of life in prison. We affirmed Torres's conviction on direct appeal, *State v. Torres*, 632 N.W.2d 609, 611 (Minn. 2001), and we subsequently affirmed the summary denial of his first petition for postconviction relief, *Torres v. State*, 688 N.W.2d 569, 571 (Minn.2004).

In his second petition for postconviction relief, Torres seeks a new trial based on statements made by Sailor indicating that Sailor, not Torres, killed J.S. In October 2008, Torres's girlfriend, R.T., whom Torres later married, began communicating with Sailor in an effort to elicit Sailor's admission that he, not Torres, killed J.S. R.T. posed as a criminal justice student from England and told Sailor that she was

facts addressed here to those related to this appeal.

writing an essay on closed criminal cases for a school assignment. Many of Sailor's responses to R.T.'s questions about his involvement in the murder were vague, and Sailor initially identified Torres as the person who killed J.S.

During the course of their communications, R.T. led Sailor to believe that they were involved in a serious romantic relationship. Sailor advised R.T. that his admissions would be limited to the facts stated in his plea agreement. He also expressed concern that corrections officials were reviewing his letters and monitoring his telephone calls. Sailor promised R.T. that he would be "as honest with [her] ... as [he could] under the [circumstances]." With these concerns in mind, R.T. and Sailor purportedly used "codes" to communicate about Sailor's involvement in J.S.'s murder. Sailor also made more explicit statements to R.T. indicating that he, not Torres, killed J.S. During a telephone call with Sailor, for example, R.T. asked if Sailor "blamed it on Rusttee" to protect himself. Sailor replied, "Of course. And everything else just happened to fall into place.... Why should I do a life sentence when someone else can do it for me[?]" Sailor told R.T. that Torres "sent [him] to prison for a burglary [he] didn't even do" and that, while Sailor was serving his sentence for the burglary, Torres raped a close friend that Sailor considered his sister. Sailor indicated that revenge motivated him to falsely accuse Torres of J.S.'s murder.

Torres petitioned for postconviction relief, contending that Sailor's statements to R.T. were both newly discovered evidence that Sailor was J.S.'s killer and a recantation of Sailor's trial testimony that Torres killed J.S. Torres claimed that his petition, which was filed in March 2011—well after the limitations period in Minn.Stat. § 590.01, subd. 4(a) (2012), expired—satis-fied both the newly discovered evidence exception, Minn.Stat. § 590.01, subd. 4(b)(2) (2012), and the interests of justice exception, Minn.Stat. § 590.01, subd. 4(b)(5) (2012), to the statute of limitations. The postconviction court held an evidentiary hearing on the petition.

At the hearing, R.T. testified about her ploy to induce Sailor to admit both that he killed J.S. and that he testified falsely at trial. R.T. indicated that Sailor, whom she intentionally misled, believed that they were in a relationship and proposed marriage to her.

Sailor also testified at the hearing. He explained that R.T. told him she wanted to study J.S.'s murder because "the violence of the crime excited her." He denied including coded responses about his role in J.S.'s death in his letters to R.T. Sailor admitted being concerned about making admissions that were not reflected in his plea agreement, but he testified that his statements to R.T. suggesting that he killed J.S. were intended to impress her by demonstrating that he was a "big man on campus." He claimed that he was "just playing the game with her" and disavowed testifying against Torres for revenge. Consistent with his trial testimony, Sailor testified that Torres killed J.S.

Sailor's statements to Faribault police officer Alan Shuda also were admitted at the evidentiary hearing. Officer Shuda interviewed Sailor after Torres petitioned for postconviction relief. Sailor told Officer Shuda that his testimony at Torres's trial was truthful and that he had lied to R.T. Sailor also told Officer Shuda that he explained in his final letter to R.T. that he did not kill J.S. This letter, which Torres did not include among those exhibits offered in support of his postconviction petition, was later obtained by the State and admitted as evidence at the hearing.

The postconviction court denied Torres a new trial. After applying the legal standard for newly discovered evidence established in *Rainer v. State*, 566 N.W.2d 692, 695 (Minn.1997), and the legal standard for claims of false testimony established in *Larrison v. United States*, 24 F.2d 82, 87–88 (7th Cir.1928), the postconviction court concluded that Torres satisfied neither standard.

Torres now challenges the denial of his postconviction petition, which seeks a new trial based on newly discovered evidence. He does not contest the postconviction court's application of the *Larrison* standard.[2]

■ We review the postconviction court's decision to deny a new trial based on newly discovered evidence for an abuse of discretion. *State v. Hurd*, 763 N.W.2d 17, 34 (Minn.2009). In doing so, we review the postconviction court's legal conclusions de novo, and we review its findings of fact for clear error. *See Davis v. State*, 784 N.W.2d 387, 390 (Minn.2010); *Doppler v. State*, 771 N.W.2d 867, 875 (Minn.2009).

■ At a hearing on a petition for postconviction relief, the petitioner must prove the facts alleged in the petition by a fair preponderance of the evidence. Minn. Stat. § 590.04, subd. 3 (2012). To obtain a new trial based on newly discovered evidence, a petitioner must prove that the evidence: (1) was not known to the defendant or defense counsel at the time of the trial; (2) could not have been discovered through due diligence before trial; (3) is not cumulative, impeaching, or doubtful; and (4) would probably produce an acquittal or a more favorable result. *Scherf v. State*, 788 N.W.2d 504, 507–08 (Minn.2010) (citing *Rainer v. State*, 566 N.W.2d 692,

695 (Minn.1997)). As to the third prong of the *Rainer* test, we have "stressed that in order for a new trial to be granted, new evidence must be more than merely material[;] the evidence must also not be doubtful. In other words, the evidence must be credible." *Race v. State*, 504 N.W.2d 214, 217–18 (Minn.1993). To be material and not merely cumulative, impeaching, or doubtful, "the confession of a purported alternative perpetrator must 'come forward in a credible manner from a credible source.'" *State v. Fort*, 768 N.W.2d 335, 345 (Minn.2009) (quoting *Wayne v. State*, 747 N.W.2d 564, 566 (Minn.2008)).

## I.

■ The postconviction court determined that Torres failed to satisfy the third prong of the *Rainer* test because Sailor's alleged statements that he killed J.S. were doubtful and lacked credibility. The postconviction court observed that it was unclear whether any of Sailor's statements to R.T. constituted an admission of guilt. Sailor claimed that he lied to R.T. and "told her what he believed she wanted to hear." Moreover, Sailor maintained that his statements that Torres killed J.S. (which appeared in both his first and final letters to R.T.) were truthful. Based on the evidence presented, the postconviction court determined it was improbable that a new trial would produce a different result.

The postconviction court also concluded that Torres failed to satisfy the fourth prong of the *Rainer* test. In support of this conclusion, the postconviction court reasoned that even if credible, Sailor's statements that he killed J.S. would not "probably produce" an acquittal or a more favorable result for Torres, *Rainer*, 566 N.W.2d at 695, because Torres could be

---

**2.** Because the State has failed to raise on appeal the timeliness of Torres's claim of newly discovered evidence, that issue is not before us. *See McDonough v. State*, 827 N.W.2d 423, 426 n. 2 (Minn.2013).

convicted of J.S.'s murder under a theory of accomplice liability.[3]

In contesting the postconviction court's determination that he failed to satisfy the third prong of the *Rainer* test, Torres argues that the postconviction court erred by finding that Sailor's statements to R.T. were doubtful and lacked credibility. Torres maintains that the communications between Sailor and R.T. contain statements that are "highly consistent" with Sailor's role in the murder and demonstrate Sailor's motive to accuse Torres of the murder.

We are not persuaded. Even if Sailor stated that he killed J.S., Sailor testified at the postconviction hearing that his statements were false and were motivated by his desire to maintain his relationship with R.T. He lied to R.T. about the circumstances surrounding J.S.'s death and his role in the murder, Sailor testified, because he wanted R.T. to like him. At the evidentiary hearing and in his interview with Officer Shuda, Sailor maintained that his trial testimony that Torres killed J.S. was truthful. And, in his early letters to R.T., Sailor maintained that Torres killed J.S. Moreover, Sailor apologized in his final letter to R.T. and explained that he did not kill J.S. He merely lied to get R.T. "to stop asking questions about this dumb crime."

There is ample factual support for the district court's finding that Sailor's statements to R.T. were doubtful and lacked credibility. The elaborate scheme that led to Sailor's inculpatory statements and Sailor's ultimate denial that he was J.S.'s killer clearly establish that Sailor's inculpatory statements did not " 'come forward in a credible manner from a credible source.' " *Fort,* 768 N.W.2d at 345 (quoting *Wayne,* 747 N.W.2d at 566). Because Sailor maintains that Torres killed J.S., any inculpatory statements that Sailor made in his letters and phone conversations with R.T. are merely impeaching. The postconviction court's finding that the evidence presented by Torres was doubtful and lacked credibility therefore was not clearly erroneous. Accordingly, the postconviction court did not abuse its discretion by denying Torres a new trial.

## II.

Torres also argues that the postconviction court erred by concluding that Torres failed to prove that the newly discovered evidence would probably produce an acquittal or a more favorable result at a new trial. *See Rainer,* 566 N.W.2d at 695. Because the district court did not err in its analysis under the third prong of the *Rainer* test, we need not reach this issue. *See Scherf,* 788 N.W.2d at 508. In addition, Torres seeks a new trial in the interests of justice because his sentence is disproportionate to that received by his codefendants. Torres did not raise this issue before the postconviction court, and he fails to cite any legal authority in support of his claim. We, therefore, decline to address the merit of this argument. *See State v. Bartylla,* 755 N.W.2d 8, 22 (Minn.2008) (stating that we "will not consider pro se claims on appeal that are unsupported by either arguments or citations to legal authority"); *Powers v. State,* 731 N.W.2d 499, 502 (Minn.2007) (declin-

---

3. The State argues that the postconviction court erred by concluding that Sailor's statements satisfied the first prong of the *Rainer* test because Torres was present at the scene of J.S.'s murder and would have known that Sailor killed J.S. at the time of his trial. Be- cause we affirm the postconviction court based on its analysis under the third prong of the *Rainer* test, we need not address whether the postconviction court's analysis under the first prong is erroneous.

ing to address issue that was not raised in the postconviction court).

In sum, the postconviction court's decision to deny Torres's petition for postconviction relief is legally sound.

Affirmed.

LILLEHAUG, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.