*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-2102**

State of Minnesota,
Respondent,

vs.

Damien Tito Jones,
Appellant.

**Filed November 30, 2015
Affirmed
Rodenberg, Judge**

Ramsey County District Court
File No. 62-CR-13-9459

Lori Swanson, Attorney General, St. Paul, Minnesota; and

John Choi, Ramsey County Attorney, Kaarin Long, Assistant County Attorney, St. Paul, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Andrea Barts, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Schellhas, Presiding Judge; Rodenberg, Judge; and Reilly, Judge.

## UNPUBLISHED OPINION

**RODENBERG**, Judge

On appeal from his conviction for attempted second-degree intentional murder, appellant Damien Tito Jones argues that the district court's refusal to instruct the jury on

the defense of voluntary intoxication and the elements of second-degree assault denied him a fair trial. We affirm.

## FACTS

Appellant was charged with attempted first-degree murder and attempted intentional second degree murder. After a jury trial, appellant was acquitted of the former and convicted of the latter charge.

On December 9, 2013, at approximately 10:30 p.m., appellant and E.G. began arguing about E.G.'s desire to end their relationship. E.G. could tell that appellant had been drinking alcohol because he "turns into someone else" and becomes angry and aggressive when he has been drinking or is under alcohol's influence. At some point, E.G. went into her son's bedroom because he had awakened during the argument. Appellant followed E.G. and tried to persuade her to leave the bedroom. When E.G. refused, appellant threw crackers at her, slapped her, and pushed her head against the wall. Appellant and E.G. left her son's bedroom and argued for several more hours. E.G. eventually returned to her son's bedroom. Appellant again told her to leave the bedroom. E.G. declined and asked appellant to leave. Appellant left the room, put E.G.'s large dogs in the backyard, locked the back door, and returned to the bedroom with a pocket knife.

Appellant pulled E.G. from the bed and said, "I'm going to kill you, bitch." He stabbed E.G. repeatedly. E.G. and her son begged him to stop and repeatedly said his name "to get him to snap out of it." Appellant's eyes were "big" and "mean, evil looking." E.G. eventually shed her robe, ran to the bathroom and locked the door. After

2

appellant left approximately five minutes later, E.G. crawled to her living room area and called 911.

St. Paul Police Officers Steven Jaworski and Zachary Nayman arrived at the scene, entered through the now-open back door, and observed appellant's jacket with blood on it and a shoe lying outside on the back porch in the snow. Paramedics transported E.G. to the hospital, where they determined that she was suffering from shock due to severe blood loss and needed surgery to repair nerve damage to her right arm. E.G. sustained so many wounds that the doctors did not count them. She had two cuts on her neck near her carotid arteries, a stab wound to her chest that caused her lung to collapse, a deep cut through her lower abdomen, and an additional wound that punctured her liver.

Appellant was arrested approximately three days later. While in custody, he told a sheriff's deputy, "I stabbed my girlfriend, I'm not proud of it." Concerning his alcohol consumption before the incident, appellant told Sergeant Jesse Mollner that he recalled that he "made a drink" of whiskey earlier in the evening. He remembered leaving the residence and admitted leaving his personal vehicle and driving a work van instead. He claimed that he "didn't want to offer information that was broken up blocks of information."

The only disputed issue at trial was appellant's mental state. Sergeant Mollner testified that appellant's interview statement was not chronological because "he had a lot of emotions," was "hesitant" to provide specific details, and detached himself from the crime. E.G. testified that appellant is an alcoholic who drinks regularly and has a "high

tolerance" for alcohol.  She also stated that she did not believe that appellant was so intoxicated that he did not know what he was doing when he stabbed her.  Appellant moved for jury instructions concerning voluntary intoxication and on the elements of second-degree assault as an alternative to the charges of attempted murder.  The district court denied both motions, concluding that the evidence was insufficient to warrant a voluntary-intoxication instruction and that second-degree assault is not a lesser-included offense to attempted intentional murder.  The jury found appellant not guilty of attempted intentional first-degree murder and guilty of attempted intentional second-degree murder.  Appellant was sentenced to an executed sentence of 240 months.  This appeal followed.

## D E C I S I O N

We review the district court's refusal to give a requested jury instruction for abuse of discretion.  *State v. Cole*, 542 N.W.2d 43, 50 (Minn. 1996).  We focus on whether the refusal resulted in error.  *State v. Kuhnau*, 622 N.W.2d 552, 555 (Minn. 2001).  A criminal defendant "is entitled to an instruction on 'his theory of the case if there is evidence to support it.'"  *State v. Lopez*, 587 N.W.2d 26, 28 (Minn. 1998) (quoting *State v. Ruud*, 259 N.W.2d 567, 578 (Minn. 1977)).

## I.     Voluntary-Intoxication Instruction

Appellant argues that the district court abused its discretion by refusing to give a voluntary-intoxication jury instruction.  Minnesota law provides:

> An act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind.

4

Minn. Stat. § 609.075 (2014). In order for the district court to give a voluntary-intoxication jury instruction, "(1) the defendant must be charged with a specific-intent crime; (2) there must be . . . a preponderance of the evidence [showing] that the defendant was intoxicated; and (3) the defendant must offer intoxication as an explanation for his actions." *State v. Torres*, 632 N.W.2d 609, 616 (Minn. 2001). However, a defendant is only entitled to a voluntary-intoxication instruction if there is evidentiary support for it. *Id.* "[C]onsumption of intoxicants does not create a presumption of intoxication and the possibility of intoxication does not create the presumption that a defendant is thereby rendered incapable of intending to do a certain act." *Id.* at 617 The defendant bears the burden of showing by a fair preponderance of the evidence that he was too intoxicated to form intent. *State v. Wahlberg*, 296 N.W.2d 408, 418 (Minn. 1980). "In deciding whether an instruction is warranted, we . . . must view the evidence in the light most favorable to the defendant." *State v. Radke*, 821 N.W.2d 316, 328 (Minn. 2012).

Appellant was charged with specific-intent crimes and offered intoxication as an explanation for his actions. *See* Minn. Stat. §§ 609.17, .185(a)(1), .19, subd. 1(1) (2012). Here, the district court determined that there was no "proof" that appellant was unaware of his actions because of his alcohol consumption. In considering a voluntary-intoxication instruction, the district court was required to view the evidence in the light most favorable to appellant. *State v. Wilson*, 830 N.W.2d 849, 855-56 (Minn. 2013).

In *Wilson*, the supreme court determined that "[e]vidence that Wilson smelled like she had been consuming alcohol, was intoxicated, and had been at a bar drinking alcohol

5

[until 1:45 a.m., shortly before the crime occurred] without more, is insufficient to warrant a jury instruction on voluntary intoxication." *Id.* at 856. However, the supreme court concluded that, combined with two trained officers' observations that the defendant looked "very confused," was "belligerent" and "un-cooperative" at the time of her arrest, had a "different look on her face," as well as the defendant's proffer concerning alcohol and its effect on her perceptions, the record was sufficient to satisfy the defendant's burden of production to support the requested instruction. *Id.*

Here, appellant claims the evidence shows he was intoxicated because (1) he remembers "[making] a drink" of whiskey prior to 10:30 p.m.,[1] (2) E.G. testified that she knew appellant had been drinking because he "turns into somebody different" and becomes angry and aggressive when he has been drinking or is "under the influence," and (3) E.G. and her son said appellant's name repeatedly during the stabbing "to get him to snap out of it," and he had "big" and "mean, evil looking" eyes while he was stabbing E.G.

The circumstances here are different than those in *Wilson*. Here, there is scant evidence of intoxication. There is no record evidence concerning how much alcohol appellant had had to drink (other than appellant's statement to Sergeant Mollner that he had "a drink"), how long appellant had been drinking, or if appellant continued drinking during the hours-long argument. E.G. is not a peace officer trained in observing indicia of intoxication, and her descriptions of appellant are more indicative of rage than of

---

[1] Appellant's trial counsel repeatedly alleged that appellant had consumed nearly a full bottle of whiskey prior to the incident. Our careful review of the record reveals no evidentiary support for this assertion.

intoxication. Further, there is no evidence in the record that appellant exhibited other indicia of intoxication, such as an odor of alcohol, bloodshot and watery eyes, poor coordination, or slurred speech. *Id.* at 856; *see State v. Kier*, 678 N.W.2d 672, 678 (Minn. App. 2004) (noting that odor of alcohol, bloodshot and watery eyes, and slurred speech are indicia of intoxication); *State v. Clark*, 361 N.W.2d 104, 106 (Minn. App. 1985) (noting that poor coordination is one of the "usual signs of being intoxicated");. E.G. testified that appellant has a "high tolerance" for alcohol and that she did not believe that appellant was too intoxicated to be aware of his actions. The record contains little or no evidence contrary to E.G.'s testimony.

Appellant's assertion that Sergeant Mollner's testimony reflects his intoxication because he could not remember specific details of the incident or remember the events chronologically during the post-arrest interview misreads the sergeant's testimony. Sergeant Mollner testified that appellant's interview was not chronological because "he had a lot of emotions," was "hesitant" to provide specific details, and seemed to have detached himself from the crime. Appellant remembered stabbing E.G., leaving the scene in his vehicle, and switching vehicles after the stabbing.

We conclude that the district court did not err in declining the requested voluntary-intoxication instruction on this record. Moreover, and even if we were to conclude that appellant sufficiently established his intoxication to warrant an instruction, any error concerning the instruction would be reversible only if it was not harmless. *Wilson*, 830 N.W.2d at 857. Here, we are satisfied that the omitted instruction would have had no impact on the verdict. The omitted voluntary-intoxication instruction would have

7

informed the jury how it may consider evidence of intoxication when determining whether appellant formed the requisite intent. "The nature of the instructional error presented here makes it less likely that the error significantly impacted the verdict, especially because the jury was not affirmatively instructed on an incorrect view of the law." *Id.* (citing *Koppi*, 798 N.W.2d at 364-65).

More importantly, the evidence regarding appellant's intent is overwhelming. Appellant repeatedly resorted to physical violence during the hours-long argument. After E.G. told him to leave, appellant put E.G.'s large dogs in the back yard, locked the back door, and retrieved a pocket knife before returning to E.G.'s son's bedroom to stab E.G. Appellant expressed his intentions when he pulled E.G. from the bed and said, "I'm going to kill you, bitch." He then stabbed her repeatedly until she escaped and locked herself in the bathroom. Finally, the severity of E.G.'s blood loss, the cuts to her neck near carotid arteries, the severing of the ulnar nerve in her right arm, and stab wounds to her chest and abdomen that collapsed her lung, exposed her intestines, and punctured her liver further evidence appellant's intent to kill. *See State v. Prtine*, 784 N.W.2d 303, 313 (Minn. 2010) (stating that the nature and extent of the victim's injuries, including 63 stab wounds around the face and neck, "readily support[ed] the conclusion that [victim's] assailant intended to kill."); *State v. Raymond*, 440 N.W.2d 425, 426 (Minn. 1989) (intent to kill could be inferred from blood loss due to ten or eleven stab wounds and the assailant's act of leaving victim to bleed to death).

The record contains overwhelming evidence that appellant acted with the requisite intent and therefore could not and would not have prevailed had a voluntary-intoxication

8

instruction been given. The absence of a voluntary-intoxication jury instruction did not have a significant impact on the verdict.

## II. Assault Instruction

Appellant argues that his right to present a defense was violated by the district court's refusal to instruct the jury on the elements of second-degree assault under Minn. Stat. § 609.222, subds. 1 and 2 (2012), as a lesser charge.

A district court "must give a lesser-included offense instruction when (1) the lesser offense is included in the charged offense; (2) the evidence provides a rational basis for acquitting the defendant of the offense charged; and (3) the evidence provides a rational basis for convicting the defendant of the lesser-included offense." *State v. Dahlin*, 695 N.W.2d 588, 598 (Minn. 2005). Denial of a requested lesser-included-offense instruction is reviewed for abuse of discretion. *Id.* at 597.

A lesser-included offense is one that is (1) a lesser degree of the same crime; (2) an attempt to commit the crime charged; (3) an attempt to commit a lesser degree of the same crime; (4) a crime necessarily proved if the crime charged were proved; or (5) a petty misdemeanor necessarily proved if the misdemeanor charge were proved. Minn. Stat. § 609.04, subd. 1 (2014). "In determining whether one offense necessarily is proved by the proof of another, 'the trial court must look at the statutory definitions rather than the facts in a particular case.'" *State v. Gisege*, 561 N.W.2d 152, 156 (Minn. 1997) (quoting *State v. Gayles*, 327 N.W.2d 1, 3 (Minn. 1982)). A person who "with intent to commit a [murder], does an act which is a substantial step toward . . . the commission of the [murder]" is guilty of attempted murder. *See* Minn. Stat. § 609.17, subd. 1 (2014).

9

The mens rea required to commit second-degree murder is "intent to effect the death of that person or another, but without premeditation." Minn. Stat. § 609.19, subd. 1 (2014).

One element of second-degree assault is that the assault must have been completed using "a dangerous weapon." Minn. Stat. § 609.222, subds. 1, 2. The charged offenses of attempted first- and second-degree murder do not include that element. Consequently, second-degree assault is not a lesser-included offense of attempted first-degree murder, *State v. Whisonant*, 331 N.W.2d 766, 769 (Minn. 1983), or of attempted second-degree murder, *Gayles*, 327 N.W.2d at 3.

Appellant urges us to adopt the Eighth Circuit's reasoning in *U.S. v. Brown*, which held that a defendant charged with armed bank robbery was entitled to an instruction on the offense of accessory after the fact because "it would be impossible for [Brown] to assist the offender if he was the offender." 33 F.3d 1002, 1003 (8th Cir. 1994). However, the Minnesota Supreme Court has declined to consider adopting the *Brown* analysis. *State v. Flowers*, 788 N.W.2d 120, 133 (Minn. 2010) ("[W]e decline to consider adopting *Brown*").[2] The district court did not abuse its discretion by denying appellant's request for a second-degree assault instruction.

---

[2] We also observe that this case is unlike *Brown*, because appellant was the only offender, and thus it was possible for him to both assault and attempt to murder E.G. The state had the discretion to charge appellant with attempted first- and second-degree murder, rather than with second-degree assault; it chose to do so and prevailed at trial on the latter charge. *See State v. Kiminski*, 474 N.W.2d 385, 389 (Minn. App. 1991) ("[The state has] discretion to choose the more serious or the less serious [charge], or both, when the facts to them appear to involve more than one criminal statute.").

10

### III.   Cumulative Effect of Alleged Errors

Appellant argues that the aggregation of alleged errors demonstrates that he did not receive a fair trial.  A defendant is deprived of a procedurally fair trial when "the number of errors and the seriousness of some of them" render us "unable to determine whether the jury based its verdict on the admissible evidence and the reasonable inferences derived therefrom." *State v. Mayhorn*, 720 N.W.2d 776, 792 (Minn. 2006). "Cumulative error exists when the cumulative effect of the . . . errors and indiscretions, none of which alone might have been enough to tip the scales, operate to the defendant's prejudice by producing a biased jury." *State v. Penkaty*, 708 N.W.2d 185, 200 (Minn. 2006) (quotation omitted).  Here, there are no errors to accumulate.  Appellant is not entitled to a new trial.

**Affirmed.**