STATE of Minnesota, Respondent,

v.

Thomas Lee FAIRBANKS, Appellant.

No. A11–2164.

Supreme Court of Minnesota.

Feb. 5, 2014.

Lori Swanson, Attorney General, John B. Galus, Assistant Attorney General, Saint Paul, MN; and Darlene Rivera, Mahnomen County Attorney, Mahnomen, MN, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Theodora Gaïtas, Special Assistant State Public Defender, Saint Paul, MN, for appellant.

## OPINION

LILLEHAUG, Justice.

Appellant Thomas Lee Fairbanks was found guilty by a jury of first-degree murder of a peace officer, failure to render aid to a shooting victim, four counts of first-degree assault, two counts of second-degree assault, being a felon in possession of a firearm, and attempted theft of a motor vehicle in connection with the shooting death of Mahnomen County Deputy Sheriff Christopher Lee Dewey. On appeal, Fairbanks makes four arguments: (1) the district court abused its discretion when it transferred venue to Polk County; (2) the common law "year-and-a-day rule" barred the murder prosecution; (3) the district court abused its discretion by admitting into evidence several autopsy photographs and a "spark-of-life" photograph of Deputy Dewey; and (4) the evidence was insufficient to support the jury's verdicts finding Fairbanks guilty of four counts of first-degree assault. We reverse one of the first-degree assault convictions, but otherwise affirm.

During the evening of February 17, 2009, Fairbanks began drinking alcohol at his trailer home in Mahnomen. He and an acquaintance, Daniel Curt Vernier, drank more alcohol at the nearby Shooting Star Casino. They returned to Fairbanks' home. Fairbanks then took a 9–millimeter pistol and fired several shots inside and outside the home. On two separate occasions, police came to Fairbanks' home to investigate the gunfire.

At approximately 7:00 a.m. on February 18, 2009, Fairbanks and Vernier walked to a neighbor's house in order to get more alcohol and elude police. Fairbanks took the pistol with him. Shortly thereafter, Deputy Dewey arrived by squad car, left his vehicle, and walked towards Fairbanks and Vernier. Without provocation, Fairbanks fired at Deputy Dewey, severely injuring him with shots to the head and abdomen. When another deputy arrived, Fairbanks and Vernier retreated to Fairbanks' home. Meanwhile, Deputy Dewey was transported to the Mahnomen Health Center, and then airlifted to a hospital in Fargo.

Over the next several hours, police arrived and surrounded Fairbanks' home. During the standoff, multiple officers reported hearing gunfire coming from Fairbanks' home. Two muffled shots were heard at 8:30 a.m. A third more distinct shot was heard at approximately 9:10 a.m., and it may have struck an adjacent home. Vernier testified that Fairbanks was responsible for the gunfire.

Fairbanks later fell asleep in his home. Vernier then grabbed the pistol from the sleeping Fairbanks, left the house, and surrendered to the police. Eventually Fairbanks surrendered without incident. Fairbanks was charged with attempted murder and other felony offenses.

Fairbanks moved for a change of venue on prejudicial publicity grounds. The State did not object to transferring the trial from Mahnomen County. After considering several alternatives, the district court decided to try the matter in Polk County. Fairbanks, a Native American, objected to Polk County on the ground that it had a low percentage of Native Americans. He also argued that the transfer did not ameliorate his prejudicial publicity concerns. The district court denied Fairbanks' motion to transfer venue from Polk County.

As Fairbanks' trial drew closer, Deputy Dewey's condition deteriorated and he entered hospice care. He died on August 9, 2010, about 18 months after he was shot. Following Deputy Dewey's death, Fairbanks was indicted for first-degree murder of a peace officer. The district court determined that the common law year-and-a-day rule did not bar Fairbanks' murder prosecution.

Before trial, Fairbanks moved in limine to exclude autopsy photographs and a spark-of-life photograph of Deputy Dewey. Of particular concern to Fairbanks was the photographic comparison of Deputy Dewey's upper body and face before the shooting to his face as it appeared during the autopsy. The district court denied the motion to exclude and ruled that the photographs were admissible. The State used the photographs in its opening statement. Immediately after the opening and out of hearing of the jury, Fairbanks objected. The district court overruled Fairbanks' objection. Later, through a medical examin-

er, the photographs were offered and received into evidence.

Fairbanks testified at trial. He admitted shooting Deputy Dewey with the 9–millimeter pistol. Fairbanks' defense was that he was "very intoxicated and on drugs" at the time of the shooting, and was thereby unable to form the requisite intent.

At the conclusion of the month-long trial, the Polk County jury rejected Fairbanks' intoxication defense and found him guilty of first-degree murder of a peace officer, Minn.Stat. § 609.185(a)(4) (2012); failure to render aid to a shooting victim, Minn.Stat. § 609.662, subd. 2(a) (2012); four counts of first-degree assault, Minn. Stat. § 609.221, subd. 2(a) (2012); two counts of second-degree assault, Minn. Stat. § 609.222, subd. 1 (2012); being a felon in possession of a firearm, Minn.Stat. § 609.165, subd. 1b (2012); and attempted theft of a motor vehicle, Minn.Stat. § 609.52, subd. 2(a)(17) (2012). On the first-degree murder charge, the district court sentenced Fairbanks to the mandatory term of life in prison without the possibility of release. Fairbanks appealed.

I.

Fairbanks' first argument on appeal is that the district court abused its discretion when it transferred venue to Polk County. Under the Minnesota Constitution, Fairbanks had a right to be tried in the county or district in which the alleged crime occurred. Minn. Const. art. I, § 6; *see also* Minn. R.Crim. P. 24.01 ("The case must be tried in the county where the offense was committed unless these rules direct otherwise."). As the alleged crime occurred in Mahnomen County, Fairbanks would have been tried there but for his motion to transfer venue and the district court's decision to grant it. Fairbanks cannot, and does not, challenge the district court's de-

cision to move his case from Mahnomen County, as he requested. Instead, he contends that the district court erred by selecting Polk County as the venue.

■ The standard of review on a venue transfer challenge is whether the district court abused its discretion. *State v. Blom*, 682 N.W.2d 578, 607 (Minn.2004); *State v. Fratzke*, 354 N.W.2d 402, 406 (Minn.1984); *see also State v. Webber*, 292 N.W.2d 5, 12 (Minn.1980) (reviewing for an abuse of discretion the district court's decision to change venue to a county to which the defendant objected).

Fairbanks challenges the district court's exercise of discretion in two respects. First, Fairbanks posits that the new venue did not cure the concern that prompted his original motion: prejudicial pretrial publicity. Fairbanks claims that much of the pretrial publicity was sympathetic to Deputy Dewey and "demonized" Fairbanks. He argues that the prejudicial publicity was not mitigated adequately because the district court moved the trial to a courthouse only 55 miles from where the alleged crime occurred.

Second, Fairbanks argues that the comparative racial demographics of the new venue deprived him of his right to a fair trial. Fairbanks notes that the district court moved the case from Mahnomen County, which is 40% Native American, to Polk County, which is less than 2% Native American.

## A.

■ Turning first to allegedly prejudicial publicity, a change of venue from the county where the alleged crime occurred is warranted when "potentially prejudicial material creates a reasonable likelihood that a fair trial cannot be had." Minn. R.Crim. P. 25.02, subd. 3. While Fairbanks' motion under Rule 25.02 was not opposed by the State and was granted by the district court, Fairbanks contends that the district court abused its discretion in the relief granted. To prevail, Fairbanks must prove that he suffered actual prejudice from pretrial publicity in the new venue. *See State v. Warren*, 592 N.W.2d 440, 447–48 (Minn.1999); *State v. Everett*, 472 N.W.2d 864, 866 (Minn.1991); *State v. Kinsky*, 348 N.W.2d 319, 323 (Minn.1984). To prove actual prejudice from pretrial publicity, Fairbanks must show that the pretrial publicity influenced the specific jurors involved in the case. *Warren*, 592 N.W.2d at 447–48. "The mere fact that a juror has been exposed to pretrial publicity is insufficient to show prejudice." *Id.* at 449. Rather, the test is whether a prospective juror can set aside an impression or opinion and render an impartial verdict. *Id.* at 447–48.

■ In determining whether a defendant suffered actual prejudice, we consider, among other things, whether the pretrial publicity was factual. *Id.* at 448; *Everett*, 472 N.W.2d at 866. We also consider the length of time between the publicity and the trial. *Warren*, 592 N.W.2d at 448; *Fratzke*, 354 N.W.2d at 407; *State v. Swain*, 269 N.W.2d 707, 720 (Minn. 1978); *State v. Hogan*, 297 Minn. 430, 437, 212 N.W.2d 664, 669 (1973). And we consider whether any potential prejudice was mitigated at trial, including whether the defendant had a full and fair opportunity to question prospective jurors about the publicity and challenge those not considered impartial. *Warren*, 592 N.W.2d at 448.

Fairbanks fails to show actual prejudice from pretrial publicity in the new venue. We have reviewed carefully the publicity about which Fairbanks complains and conclude that most of it is factual. Many of the articles that Fairbanks characterizes as opinionated and inflammatory reveal

sympathy for Deputy Dewey and his family that did not result in prejudice to Fairbanks.

Moreover, any potential prejudice from nonfactual material was mitigated because a considerable period of time passed between much of the publicity and Fairbanks' trial. Of the 119 articles Fairbanks submitted with his motion to change venue from Polk County, most were published 11 months or more before trial. While the press continued to cover the case as the trial approached, the coverage was generally confined to statements of fact.

Any potential prejudice from nonfactual material was further mitigated by the district court's appropriate steps to make sure that Fairbanks received a fair trial before an impartial jury. A jury questionnaire was used. The district court directed that the State confer with the defense to identify in advance any jurors who should not be summoned to voir dire. The district court granted additional peremptory challenges to both parties. The district court conducted individual voir dire outside the presence of the other jurors, as required in first-degree murder cases by Minn. R.Crim. P. 26.02, subd. 4(3)(d). During voir dire, the district court properly gave Fairbanks' attorneys ample opportunity to question the prospective jurors about their exposure to prejudicial publicity so Fairbanks could use the additional challenges intelligently. The voir dire generated more than 4,000 pages of transcript. None of the 16 jurors selected had formed any opinion about the case, and all stated that they could set aside anything they had heard about the case and be fair and impartial. Moreover, Fairbanks did not use all of his peremptory challenges until alternate jurors were selected. *See*

*Warren,* 592 N.W.2d at 448 (stating that unused peremptory challenges suggest that a defendant was satisfied that the jurors selected would be unbiased).

Nothing submitted by Fairbanks, to the district court or on this appeal, shows that the pretrial publicity actually influenced the specific jurors involved in the case. *See id.* at 447–48. Accordingly, with respect to alleged prejudicial publicity, the district court did not abuse its discretion in transferring the case to Polk County and thereafter denying Fairbanks' motion to move it elsewhere.

### B.

We turn next to the issue of Polk County's racial demographics. Typically, this issue arises when a defendant alleges that the jury venire does not reflect a fair cross-section of the community, in violation of the Sixth Amendment. *See, e.g., Taylor v. Louisiana,* 419 U.S. 522, 527–28, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).

In this case, Fairbanks does not allege that the jury venire in Polk County failed to reflect a fair cross-section of the community. His point is quite the opposite. He argues that the fair cross-section was unfair to him because the percentage of Native Americans in the county where the case was tried was considerably lower than the percentage in the county where the shooting occurred.[1]

At the threshold, we note that, before trial, publicity—not racial demographics—was Fairbanks' primary concern. Indeed, on his motion for a change of venue from Mahnomen County, Fairbanks proposed that the district court transfer venue to Itasca County or Crow Wing County, both counties with a much smaller percentage

---

1. The jury had a single Native American. That juror did not self-identify as Native American during jury selection, but informed the district court after trial that she was a registered member of the White Earth Band of Chippewa Indians.

of Native Americans (3.7% and 0.8% respectively) than Mahnomen County. If we were to hold that the district court's decision to transfer venue to a county with a relatively low Native American percentage was an abuse of discretion, we would be forced to consider whether Fairbanks invited such error. But we need not, because we hold that the district court did not abuse its discretion.

While we have previously considered defendants' objections to particular venue transfers on the issue of pretrial publicity, we have not previously considered an objection on the issue of racial demographics. We have long been committed "to insur[ing] that the systems used are increasingly inclusive in the hope that the faces of the people in the jury room will soon mirror the faces of the people in the community at large." *State v. Williams*, 525 N.W.2d 538, 544 (Minn.1994); *see Hennepin Cnty. v. Perry*, 561 N.W.2d 889, 897 (Minn.1997). But we have also made clear that, while defendants are entitled to a fair and impartial jury, they are not entitled to one of a particular racial composition or one that precisely mirrors the racial make-up of the community. *Williams*, 525 N.W.2d at 542.

Because we need not decide, we do not decide today the extent to which a district court, in exercising its discretion, may or should consider racial demographics in deciding a venue motion. Instead, we hold that, in the particular circumstances of this case, the district court did not abuse its discretion when, after identifying, considering, and weighing multiple factors, including racial demographics, it decided to try the case in Polk County.

As discussed above, the district court's first priority was to respond to Fairbanks' primary concern—mitigating allegedly prejudicial pretrial publicity—and it did so. The record shows that the district court

also considered Fairbanks' secondary concern: racial demographics. The district court also considered factors that were not Fairbanks' primary or secondary concerns, but were proper nevertheless. These included:

1. The safety and convenience of the defendant, who was being held in Polk County because detention facilities in Mahnomen County were not adequate.

2. The traveling distances and facilities for the defendant's family, the victim's family, fact witnesses, expert witnesses, the lawyers, and others.

3. The technology and security features available in the nearly new Polk County Judicial Center.

The record as a whole shows that the district court chose the venue for trial by identifying, considering, and weighing all factors that were relevant in the circumstances. Therefore, the district court did not abuse its discretion or violate Fairbanks' right to a fair trial in deciding to try the case in Polk County over Fairbanks' objection.

## II.

■ Fairbanks next argues that the common law year-and-a-day rule bars his prosecution for murder because Deputy Dewey died 18 months after the shooting. As this is a purely legal question, our standard of review is de novo. *See State v. Wolf*, 605 N.W.2d 381, 386 (Minn.2000).

■ The year-and-a-day rule is an ancient English common law doctrine providing that a defendant may not be convicted of murder unless the victim dies from the defendant's act within a year and a day of the act. *Rogers v. Tennessee*, 532 U.S. 451, 462–67, 121 S.Ct. 1693, 149 L.Ed.2d 697 (2001). At the time of its adoption in the 13th century, the primary justification

for the rule was that medical science was unable to establish causation beyond a reasonable doubt when a great deal of time passed between the injury to the victim and the death. *Id.* at 463, 121 S.Ct. 1693.

No Minnesota constitutional provision, statute, or reported case has adopted, applied, or even acknowledged the existence of this ancient common law rule. So whether the rule exists in Minnesota is a matter of first impression. We hold that, if the rule ever existed in Minnesota, it did not survive the 1963 enactment of Minnesota's modern criminal code, for two reasons.

First, when the Legislature adopted the modern criminal code, it made clear that murder may be charged regardless of the date of the victim's death. Minnesota Statutes § 628.26(a) (2012) provides: "Indictments or complaints for any crime resulting in the death of the victim may be found or made *at any time after the death of the person killed.*" (Emphasis added).

Second, the substantive murder statutes, including the one charged in this case, Minn.Stat. § 609.185(a)(4), override any rule at common law. They provide that whoever "causes the death" of the victim is guilty of murder. *See, e.g.,* Minn.Stat. § 609.185(a)(1)–(7) (2012). The "causes" language is clear and unambiguous. Had the Legislature intended to limit the statutes to conform to the year-and-a-day rule, the statutes would have read: "causes the death within a year and a day." [2]

Accordingly, the year-and-a-day rule does not apply to the Minnesota law of homicide. The State was not barred from prosecuting Fairbanks for the murder of Deputy Dewey.

### III.

■ Fairbanks' third argument is that the district court erred in admitting into evidence several "graphic" and "disturbing" autopsy photographs of Deputy Dewey, as well as a spark-of-life photograph. Fairbanks further argues that the State improperly displayed the photographs during its opening statement, thereby depriving him of a fair trial. We review a district court's decision to admit photographic evidence for an abuse of discretion. *State v. Morrow,* 834 N.W.2d 715, 726 (Minn. 2013).

■ Photographs are admissible if they are accurate and relevant to a material issue. *State v. Hummel,* 483 N.W.2d 68, 74 (Minn.1992). And if photographs are helpful as an aid to verbal testimony, *see State v. Martin,* 261 N.W.2d 341, 344 (Minn.1977), they are not rendered inadmissible merely because they vividly show the shocking details of a crime, *Hummel,* 483 N.W.2d at 74. Further, the State may present spark-of-life evidence—e.g., a photograph of the victim before the injury occurred—so long as it is not an attempt to invoke undue sympathy or inflame the passions of the jury. *See Morrow,* 834 N.W.2d at 727; *State v. Graham,* 371 N.W.2d 204, 207 (Minn.1985).

Because Fairbanks does not dispute the accuracy of the photographs, the only issues on appeal are their relevance and alleged prejudicial effect. On relevance, to convict Fairbanks of first-degree murder of a peace officer, the State was required to prove that Fairbanks' shots caused Deputy Dewey's death 18 months later. *See*

---

2. The causation language for murder is fully consistent with the intent of the Model Penal Code, which served as a guide for Minnesota's modern criminal code, *see* Report of Advisory Committee on Revision of the Criminal Code iv (1962), to eliminate the year-and-a-day rule, *see* Model Penal Code § 210.1 cmt. n. 4 (Proposed Official Draft 1962 & rev. cmts.1980).

Minn.Stat. § 609.185(a)(4). As part of the State's proof, the medical examiner who performed Deputy Dewey's autopsy testified regarding the cause of death. The autopsy photographs were displayed during this testimony to illustrate the physical changes to Deputy Dewey due to the shooting. The autopsy photographs specifically supported the medical examiner's testimony about Deputy Dewey's massive weight loss, his inability to swallow and receive enough nutrition, the pressure ulcers that developed on his body, and the effect of the multiple skull fractures he suffered. Therefore, the autopsy photographs were highly relevant on the issue of causation.

■ On prejudicial effect, it is true that the autopsy photographs were graphic. But the disturbing nature of the photographs did not render them inadmissible. *See Hummel,* 483 N.W.2d at 74. The autopsy photographs objectively portrayed Deputy Dewey's condition at death and were sufficiently explained by a qualified medical professional. The spark-of-life photograph also assisted the jury in understanding the severity of Deputy Dewey's injuries and the effects of the shots on his body. There is nothing in the record to suggest that the State used the spark-of-life photograph to invoke undue sympathy or inflame the jury's passions.

■ Finally, the State's use of the photographs during its opening statement did not deprive Fairbanks of a fair trial. It has long been the practice in our trial courts that, in the discretion of the court, photographs, documents, charts, and the like may be displayed during opening statement if they have been preliminarily admitted into evidence or the court otherwise grants leave. *See* 23A C.J.S. *Criminal Law* § 1692 (2006); *cf.* Minn. Gen. R. Prac., Part H, Minnesota Civil Trialbook § 8(a) (explaining that pictures may be used in opening statement if admitted into evidence, agreed to by stipulation, or by leave of court).

In this case, after considering Fairbanks' motion in limine to exclude the photographs, the district court ruled that the photographs were admissible. Immediately after the State used them in its opening statement, and consistent with its earlier ruling, the district court overruled Fairbanks' objection, thereby confirming that leave of court had been granted. Later, and also consistent with previous rulings, the photographs were offered and received into evidence. We see no abuse of discretion in any of these rulings.

### IV.

■ Fairbanks' final argument on appeal is that the evidence was insufficient to support his convictions on four counts of first-degree assault under Minn.Stat. § 609.221, subd. 2(a). That law provides: "[w]hoever assaults a peace officer or correctional employee by using or attempting to use deadly force against the officer or employee while the officer or employee is engaged in the performance of a duty" is guilty of first-degree assault. Minn.Stat. § 609.221, subd. 2(a). Deadly force includes "[t]he intentional discharge of a firearm . . . in the direction of another person, or at a vehicle in which another person is believed to be." Minn.Stat. § 609.066, subd. 1 (2012).

On appeal, Fairbanks contends that the evidence regarding the first-degree assault counts was purely circumstantial. He argues that, because the circumstantial evidence was consistent with rational hypotheses other than guilt, the convictions must be reversed.

■ When the sufficiency of evidence is challenged, we review the evidence "to determine whether, given the

facts in the record and the legitimate inferences that can be drawn from those facts, a jury could reasonably conclude that the defendant was guilty of the offense charged." *State v. McArthur*, 730 N.W.2d 44, 49 (Minn.2007) (citation omitted) (internal quotation marks omitted). If a conviction, or a single element of a criminal offense, is based solely on circumstantial evidence, such evidence, viewed as a whole, must be consistent with guilt and inconsistent with any other rational hypothesis except that of guilt. *State v. Al-Naseer*, 788 N.W.2d 469, 474–75 (Minn. 2010).

 If the evidence is wholly circumstantial, we must first identify the circumstances proved by the State, deferring to the jury's acceptance of the State's proof of those circumstances and rejection of any evidence in the record to the contrary. *State v. Anderson*, 789 N.W.2d 227, 241–42 (Minn.2010). We then "independently examine the reasonableness of all inferences that might be drawn from the circumstances proved, including inferences consistent with a hypothesis other than guilt." *Id.* at 242 (citation omitted) (internal quotation marks omitted). If the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis other than guilt, then the evidence is sufficient to sustain the conviction. *Id.* A jury is in the best position to evaluate circumstantial evidence, and its verdict is entitled to due deference. *State v. Webb*, 440 N.W.2d 426, 430 (Minn.1989).

Turning now to the circumstances proved at Fairbanks' trial, the State established that between 8:30 a.m. and 9:10 a.m. on February 18, 2009, at least three shots were fired from within Fairbanks' trailer home. Both Fairbanks and Vernier were inside. Three White Earth Tribal Police Officers were stationed on the south side of Fairbanks' home and five Mahnomen

County Sheriff's Deputies—who at various times were stationed behind a squad car on the east side of Fairbanks' home—were on the east side. A crime scene investigator later tracked five outbound bullet trajectories from bullet holes in Fairbanks' home, although the evidence was inconclusive regarding when the bullet holes were created.

Counts III, IV, and V alleged that Fairbanks assaulted three individual White Earth Tribal Police Officers stationed on the south side of Fairbanks' home. Fairbanks correctly observes that there were no southbound bullet trajectories and that no bullets were found south of the home. But the three officers testified that when a shot at 9:10 a.m. was fired, they heard a bullet fly by their heads and strike a building behind them. This direct evidence satisfies the "assault" and "deadly force" requirements of the first-degree assault statute. And because Vernier testified that he did not handle the 9–millimeter pistol during the standoff with police until after Fairbanks stopped shooting and fell asleep, the only reasonable, rational inference is that Fairbanks fired the shot. There is sufficient evidence to affirm Counts III, IV, and V.

 Count VIII alleged that Fairbanks assaulted five Mahnomen County Sheriff's Deputies positioned on the east side of Fairbanks' home. The deputies named in the count were, at various times during the standoff, taking cover behind a squad car. Two of the five deputies heard gunshots at approximately 8:30 a.m. Based on the physical evidence at the scene, the crime scene investigator determined that a bullet was shot from the entryway of Fairbanks' home toward the east, the direction of the squad car that provided cover for the deputies.

However, the two deputies who heard shots were unable to tell if they were the

target. The crime scene investigator was likewise unable to determine when the outbound bullet to the east was fired. As a result, the shots fired between 8:30 a.m. and 9:10 a.m. are not necessarily linked to the bullet trajectory to the east. In other words, the State relied on purely circumstantial evidence to prove that Fairbanks fired toward the squad car.

To deal with this issue on appeal, the State points to one deputy's testimony that when he knocked at Fairbanks' home hours prior to the standoff with police, he did not see any damage to the entryway. Because there was a bullet hole in the entryway after the standoff with police, the State argues that Fairbanks must have shot toward the squad car during the standoff.

At least two reasonable inferences are possible from the State's circumstantial evidence on this point. The first is that the outbound bullet hole in the entryway was created while deputies surrounded Fairbanks' home. This inference is consistent with guilt. The second reasonable inference is that the outbound bullet hole in the direction of the squad car was created in the hours after the deputy observed the entryway but before the standoff. Given Fairbanks' reckless behavior with the 9–millimeter pistol, it is as reasonable to infer that he fired out of the entryway prior to, rather than during, the standoff with police. This inference is inconsistent with guilt. Therefore, we conclude that the circumstantial evidence regarding when the shot was fired is insufficient to support Fairbanks' conviction on Count VIII.

The judgment of conviction on Count VIII is reversed. In all other respects, the judgment is affirmed.