*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A13-2312

State of Minnesota,
Respondent,

vs.

Justin Thadeus Amick,
Appellant.

**Filed February 23, 2015**
**Affirmed in part, reversed in part, and remanded**
**Schellhas, Judge**

Dakota County District Court
File No. 19HA-CR-12-986

Lori Swanson, Attorney General, St. Paul, Minnesota; and

James C. Backstrom, Dakota County Attorney, Heather D. Pipenhagen, Stacy St. George, Assistant County Attorneys, Hastings, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Stan Keillor, Special Assistant State Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Smith, Presiding Judge; Schellhas, Judge; and Hooten, Judge.

UNPUBLISHED OPINION

**SCHELLHAS**, Judge

Appellant challenges his conviction of first-degree assault and the imposition of consecutive sentences for first-degree assault and possession of a firearm by an ineligible person. We affirm appellant's conviction, reverse his sentence, and remand.

## FACTS

In the early morning hours of March 18, 2012, appellant Justin Thadeus Amick drove with M.S. to D.W.'s home in Inver Grove Heights, where Amick and M.S. drank a couple of beers. After an hour or two, they left D.W.'s home in Amick's car. Amick drove around and then stopped on the side of the road. While the car was stopped, M.S. saw lights, heard two gunshots, and saw a gun in Amick's hand. According to M.S., Amick then drove away very fast while screaming and letting go of the wheel, saying, "What have I done? What have I done?" Amick also asked M.S. to call his son's mother and drove to his own mother's West St. Paul home. Amick and M.S. entered the home and Amick yelled to his mother, "I messed up bad. This time I messed up bad." Amick left the home, and M.S. asked Amick's mother to call the police.

On March 18, 2012, Inver Grove Heights police officers Joseph Robertson and Eric Bohrer were on duty, patrolling in separate squad cars. At approximately 4:44 a.m., dispatch notified the officers that a complainant had reported hearing five gunshots near his Inver Grove Heights home. Each officer drove to the reported area without activating his squad car's lights or siren. Near the reported area, the officers saw a car parked on the side of the road and stopped their squad cars on the opposite side of the road, facing the

parked car. The officers saw a male, later identified as Amick, in the driver's seat of the parked car; a female, later identified as M.S., in the passenger seat of the car; and another male, later identified as the complainant, G.S., on foot near the car. Officer Robertson thought that the driver of the parked car resembled S.A., Amick's brother.

Officer Robertson exited his squad car, moved to a position about 10 to 15 feet away from the driver of the parked car, and gave two or three verbal commands to the car's occupants to show their hands. Officer Bohrer also exited his squad car and moved to a position about 25 to 30 feet behind Officer Robertson. Officer Robertson saw the driver of the parked car make furtive movements; noticed that the driver's hand was outside of the car's window; and "briefly saw the muzzle of a handgun, . . . heard the gun fire, . . . [and] saw the muzzle flash." After the muzzle flash dissipated, Officer Robertson again saw the muzzle of the gun and observed that the muzzle was "aimed directly" at him both before and after the gun fired. Officer Bohrer heard the driver yell, "F-ck you," and saw an "arm come out and . . . a muzzle flash and it was pointed directly at Officer Robertson." After the muzzle flash, Officer Bohrer saw a black gun in the driver's hand. While the officers moved to take cover behind Officer Robertson's squad car, Officer Bohrer heard a second gunshot.

The officers drew their guns, aimed them at the driver of the parked car, and Officer Robertson again saw that the driver was pointing the gun at him. Officer Bohrer ordered the driver to drop the gun; heard the driver yell, "Fine"; and saw the driver throw the gun, which hit the hood of Officer Robertson's squad car. The driver then put the car in reverse and backed up at a high rate of speed. Officer Robertson secured the gun that

3

the driver had thrown and radioed dispatch. Officer Robertson reported that "officers had been shot at," provided a description of the suspect car, and stated that S.A. was a possible suspect.

West St. Paul on-duty police officer Elyse Wood received information from dispatch about the shooting, including that S.A. was a possible suspect. Dispatch asked Officer Wood to respond to a West St. Paul home from which several 911 hang-up calls had been received. Dispatch told Officer Wood that the name Amick had popped up when the calls were received. Upon arrival at the home, Officer Wood immediately recognized S.A. outside the home. He was with M.S. Officer Wood also saw the suspect car. S.A. said that Amick "was inside and was going crazy." A canine officer and several other officers arrived at the home, and Amick's mother and a juvenile exited the home. Police officers apprehended Amick behind the home in some woods and found five shell casings inside the suspect car.

Respondent State of Minnesota charged Amick with two counts of attempted first-degree murder (peace officer) under Minn. Stat. §§ 609.17, subd. 1, .185(a)(4) (2010); two counts of attempted second-degree murder (intentional) under Minn. Stat. §§ 609.17, subd. 1, .19, subd. 1(1) (2010); two counts of first-degree assault (deadly force against peace officer) under Minn. Stat. § 609.221, subd. 2(a) (2010); two counts of second-degree assault (dangerous weapon) under Minn. Stat. §§ 609.02, subd. 10(1) or (2), .222, subd. 1 (2010); and possession of a firearm by an ineligible person under Minn. Stat. § 624.713, subd. 1(2) (2010). A jury found Amick guilty of one count of first-degree assault (deadly force against peace officer), one count of second-degree assault

4

(dangerous weapon), and possession of a firearm by an ineligible person. The district court sentenced Amick to 146 months' imprisonment for first-degree assault and a consecutive 60-month sentence for possession of a firearm by an ineligible person.

This appeal follows.

## DECISION

*Admissibility of statement to police*

Amick argues that the district court erred by refusing to suppress a video-recorded and transcribed statement that he gave on March 19, 2012, to Sergeant Richard Schroeder and Detective David Sjogren of the Dakota County Sheriff's Office, asserting that he invoked his right to counsel before giving the statement. The district court found that Amick was advised of his *Miranda* rights, understood them, and knowingly and intelligently waived his rights, implicitly concluding that Amick failed to invoke his right to counsel before giving the statement.

"If a criminal suspect faces custodial interrogation, the suspect must be informed that the suspect has a right to remain silent and has a right to speak with an attorney." *State v. Anderson*, 789 N.W.2d 227, 233 (Minn. 2010) (citing *Miranda v. Arizona*, 384 U.S. 436, 467–73, 86 S. Ct. 1602, 1624–27 (1966)).

> It is a violation of the U.S. Constitution for investigators to continue a custodial interrogation after a suspect has unambiguously requested the assistance of counsel. To invoke the right to counsel a suspect must do more than make reference to an attorney. A suspect's request for counsel is unequivocal if a reasonable police officer, in the circumstances, would understand the statement to be a request for an attorney.

5

. . . .

> Under the U.S. Constitution, a suspect must unambiguously and unequivocally invoke his right to counsel and investigators are not required to clarify ambiguous requests for an attorney. But we have held that suspects in Minnesota are afforded greater protection against compelled self-incrimination. The right to counsel under the Self–Incrimination Clause protects a suspect's desire to speak with police *only* through counsel. Consequently, when a suspect makes an equivocal or ambiguous statement that could be construed as a request for counsel, investigators must cease questioning the suspect except as to narrow questions designed to clarify the accused's true desires respecting counsel.

*State v. Ortega*, 798 N.W.2d 59, 70 (Minn. 2011) (quotations and citations omitted). A suspect's mere reference to an attorney or inquiry as to whether he needs an attorney is not an unequivocal request for counsel. *Id.* at 71. A district court's application of the reasonable-officer standard is reviewed de novo. *Id.* at 70. Likewise, "[appellate courts] will review de novo the application of the 'stop and clarify' rule." *Id.* But "[f]actual determinations, such as the suspect's precise words and the actions and impressions of the suspect and officer, are reviewed for clear error." *Id.* (quotation omitted).

In this case, after Detective Sjogren read the *Miranda* warning aloud, the following colloquy occurred:

> DETECTIVE SJOGREN: You understand each of those rights?
> AMICK: All right.
> DETECTIVE SJOGREN: You do?
> AMICK: I don't have a lawyer.
> DETECTIVE SJOGREN: Right.
> AMICK: I don't need, I mean I don't know if I need one right now, but I'm going to need one for court I suppose.

6

DETECTIVE SJOGREN: Yeah and you'll be going to court tomorrow, I think they have to charge you by noon if they elect to charge you with anything okay? So, you know, we wanted to clarify a few things here and ahem, you know, I just want to make sure you understand your rights. Ahem, I can read them again to you . . .
AMICK: No, I, I . . .
DETECTIVE SJOGREN: . . . if there's something that you don't understand?
AMICK: I understand them, I guess . . .
. . . .
DETECTIVE SJOGREN: Okay, so are you are you willing to talk with us? You kind a . . .
AMICK: (Inaudible).
DETECTIVE SJOGREN: . . . you kind of said something about a lawyer. I just want to clarify that you're not asking for a lawyer . . . ?
AMICK: Not at this second 'cause I just try to answer what I know . . .
DETECTIVE SJOGREN: Sure.
SERGEANT SCHROEDER: Okay.
AMICK: . . . and what I don't remember, I mean I just, I can't really, I don't want to incriminate, you know, say stupid stuff that, 'cause I'm already apparently in big trouble so.

Detective Sjogren then began his factual inquiry.

We conclude that the district court's finding that Amick was properly advised of his *Miranda* rights, understood them, and waived his rights before giving the March 19, 2012 statement is not clearly erroneous. Although Amick made references to an attorney, he also told the officers that he would "just try to answer what [he] kn[e]w." "[A] reasonable police officer, in the circumstances," would not understand Amick's words as a request for an attorney. *See Ortega*, 798 N.W.2d at 71 (quotations omitted) (concluding that "district court did not err when it held that appellant failed to unequivocally invoke his right to counsel because a reasonable police officer under the[] circumstances would

7

not understand appellant's question to be a request for an attorney" (footnote omitted)).

Even if Amick made an equivocal request for counsel, Detective Sjogren and Sergeant Schroeder did not violate the "stop and clarify" rule. The district court therefore properly denied Amick's suppression motion.

***Voluntary-intoxication jury instruction***

Amick argues that the district court erred by denying his request for a voluntary-intoxication jury instruction. Appellate courts "review a trial court's refusal to issue a requested instruction for abuse of discretion, focusing on whether the refusal resulted in error." *State v. Torres*, 632 N.W.2d 609, 616 (Minn. 2001). Voluntary intoxication is "a consideration in determining whether the specific-intent element of a crime is met." *Id.* at 615 n.2 (citing Minn. Stat. § 609.075 (2000)).

> [T]o receive a requested voluntary intoxication jury instruction: (1) the defendant must be charged with a *specific-intent crime*; (2) there must be evidence sufficient to support a jury finding, by a preponderance of the evidence, that the defendant was intoxicated; and (3) the defendant must offer intoxication as an explanation for his actions.

*Id.* at 616 *(*emphasis added). "A party must satisfy the burden of production before that party is entitled to a voluntary intoxication jury instruction." *State v. Wilson*, 830 N.W.2d 849, 854 (Minn. 2013). "When deciding whether an instruction is warranted, [appellate courts], like the trial court, must view the evidence in the light most favorable to the defendant." *Id.* at 855 (quotation omitted).

Here, without providing legal authority or analysis, Amick assumes that first-degree assault (deadly force against peace officer) is a specific-intent crime, stating that

"[t]he district court conceded[] that the . . . first-degree assault charges against appellant were specific-intent crimes." Indeed, the record reflects that the district court, the state, and Amick proceeded on the assumption that first-degree assault (deadly force against peace officer) is a specific-intent crime. And the state concedes the issue on appeal. We are not bound by the state's concession. *See State v. Werner*, 725 N.W.2d 767, 770 n.1 (Minn. App. 2007) ("While we generally accept a party's concessions, we need not do so when the party has made a concession on a threshold issue that presents a question of law, particularly when we find fault with the district court's analysis on the issue."). Appellate courts have the responsibility "to decide cases in accordance with law, and that responsibility is not to be diluted by counsel's oversights, lack of research, failure to specify issues or to cite relevant authorities." *State v. Hannuksela*, 452 N.W.2d 668, 673 n.7 (Minn. 1990) (quotation omitted)). But we need not decide whether first-degree assault (deadly force against peace officer) is a specific-intent crime—or whether Amick offered sufficient evidence to support a jury finding that he was intoxicated—because Amick did not satisfy the third requirement for a voluntary-intoxication instruction.

Amick did not satisfy the third requirement because he did not "offer intoxication as an explanation for his actions." *See Torres*, 632 N.W.2d at 616. Although Amick argued to the district court that he was too intoxicated to form intent to commit the specific-intent crimes with which he was charged, he neither presented evidence nor made an offer of proof to support his argument. *Compare id.* at 616−17 (concluding that district court acted within its discretion in determining that defendant did not offer intoxication as explanation for his actions when defendant only referenced intoxication

9

while lying about his involvement in crime and lucidly and precisely described to law enforcement all crime participants' actions, without referring to his intoxication), *with Wilson*, 830 N.W.2d at 856 (concluding that defendant offered intoxication as explanation for her actions when she "made an offer of proof to support her theory that she was so intoxicated that she was unable to form intent" (quotation omitted)). Evidence that Amick was possibly intoxicated around the time of the shooting is not equivalent to evidence that his intoxication rendered him incapable of forming specific intent. *See Wilson*, 830 N.W.2d at 856 ("[T]he mere fact of a person's drinking does not create a presumption of intoxication, and the possibility of intoxication does not create the presumption that a person is incapable of forming a specific intent." (quotation omitted)).

Because Amick did not offer intoxication as an explanation for his actions, he was not entitled to a voluntary-intoxication jury instruction. The district court did not abuse its discretion by denying Amick's request for such an instruction. And even if the court erred by declining to instruct the jury on voluntary intoxication, the error was harmless in light of the overwhelming evidence that Amick formed the specific intent to cause Officer Robertson to fear immediate bodily harm or death when Amick discharged the gun in Officer Robertson's direction. *See id.* at 857–58 (reasoning that, "consider[ing] the evidence presented at trial in its entirety, the only reasonable conclusion is that [the defendant] acted with the [requisite] intent" and concluding "beyond a reasonable doubt that the omission of the voluntary intoxication jury instruction did not significantly affect the verdict").

10

*Sufficiency of the evidence*

The jury found Amick guilty of first-degree assault (deadly force against Officer Robertson). The elements of that offense are (1) assault of Officer Robertson, (2) "by using or attempting to use deadly force against" Officer Robertson, (3) while Officer Robertson "[wa]s engaged in the performance of a duty imposed by law, policy, or rule." *See* Minn. Stat. § 609.221, subd. 2(a). "Deadly force" includes "[t]he intentional discharge of a firearm . . . in the direction of" Officer Robertson. *See* Minn. Stat. §§ 609.066, subd. 1, .221, subd. 2(c)(2) (2010). The state presented direct evidence that Amick discharged a firearm in Officer Robertson's direction; it presented only circumstantial evidence that Amick intentionally discharged the firearm. *See State v. Johnson*, 719 N.W.2d 619, 630–31 (Minn. 2006) ("[I]ntent is a state of mind and is, therefore, generally provable only by inferences drawn from a person's words or actions in light of all the surrounding circumstances." (quotation omitted)).

Amick argues that the circumstantial evidence is insufficient to prove that he intentionally discharged the gun. "If a conviction, or a single element of a criminal offense, is based solely on circumstantial evidence, such evidence, viewed as a whole, must be consistent with guilt and inconsistent with any other rational hypothesis except that of guilt." *State v. Fairbanks*, 842 N.W.2d 297, 307 (Minn. 2014). We apply a two-step analysis to determine whether circumstantial evidence is sufficient to support a guilty verdict. *State v. Anderson*, 784 N.W.2d 320, 329−30 (Minn. 2010). We first identify the circumstances proved and then "examine independently the reasonableness of the inferences that might be drawn from the circumstances proved." *State v. Moore*, 846

11

N.W.2d 83, 88 (Minn. 2014) (quotations omitted). "In identifying the circumstances proved, we assume that the jury resolved any factual disputes in a manner that is consistent with the jury's verdict." *Anderson*, 784 N.W.2d at 329. We "construe conflicting evidence in the light most favorable to the verdict and assume that the jury believed the State's witnesses and disbelieved the defense witnesses." *Moore*, 846 N.W.2d at 88. "A jury is in the best position to evaluate circumstantial evidence, and its verdict is entitled to due deference." *Fairbanks*, 842 N.W.2d at 307. But "[w]e give no deference to the fact finder's choice between reasonable inferences." *State v. Silvernail*, 831 N.W.2d 594, 599 (Minn. 2013) (quotations omitted).

Amick argues that the circumstances proved are consistent with a rational hypothesis that, when he discharged the gun in the direction of Officer Robertson, he neither had a purpose to discharge the gun nor believed that his actions would cause the gun to discharge. *See* Minn. Stat. § 609.02, subd. 9(3) (2010) ("'Intentionally' means that the actor either has a purpose to do the thing or cause the result specified or believes that the act performed by the actor, if successful, will cause that result.") Construing conflicting evidence in the light most favorable to the convictions, the circumstances proved include:

> (1) After Officer Robertson commanded Amick to put up his hands, Amick yelled, "F-ck you," and extended one of his hands out of the suspect car's window.
>
> (2) A gun was in the hand that Amick extended out of the window.
>
> (3) The gun in Amick's hand was "aimed directly" at Officer Robertson before it was discharged.

(4) Amick discharged the gun twice.

(5) The gun in Amick's hand was still "aimed directly" at Officer Robertson after it was discharged.

(6) After Officer Bohrer commanded Amick to drop the gun, Amick yelled, "Fine," and threw the gun.

(7) Amick immediately fled the scene of the shooting at a high rate of speed and drove "craz[il]y" while "screaming and letting go of the wheel, saying, 'What have I done? What have I done?'"

(8) Amick asked M.S. to call his son's mother.

(9) Amick drove to his mother's home, went inside, and "yell[ed] to his mom, 'I messed up bad. This time I messed up bad.'"

(10) Amick hid in the woods behind his mother's home.

The circumstances proved are consistent with Amick's guilt because they permit a rational inference that when he discharged the gun in Officer Robertson's direction, he either had a purpose to discharge the gun or believed that his actions would cause the gun to discharge.

Furthermore, the circumstances proved are not consistent with any rational hypothesis except that of Amick's guilt. When confronted by Officer Robertson, Amick moved the gun from inside the car to outside the car, held the gun in such a way that the muzzle was facing Officer Robertson, and yelled a threatening expletive before he twice discharged the gun in Officer Robertson's direction. After Amick discharged the gun, he fled, hid, and made multiple statements that exhibited consciousness of guilt. The

13

circumstances proved are inconsistent with any rational hypothesis that, when he discharged the gun in the direction of Officer Robertson, he neither had a purpose to discharge the gun nor believed that his actions would cause the gun to discharge. The evidence therefore is sufficient to support Amick's conviction of first-degree assault.

***Upward-departure sentence***

The permissive sentencing range for Amick's conviction of first-degree assault (deadly force against peace officer) is 120 to 160 months' imprisonment, and the mandatory sentence for his conviction of possession of a firearm by an ineligible person (prior crime of violence) is 60 months' imprisonment. *See* Minn. Stat. §§ 609.035, subd. 3, .11, subd. 5(b), .221, subd. 2(b) (2010); *State v. Williams*, 771 N.W.2d 514, 522, 524 (Minn. 2009); Minn. Sent. Guidelines II.B.1, IV, V (2010). Concurrent sentencing for these two offenses is presumptive, and consecutive sentencing is not permissive. *See* Minn. Sent. Guidelines II.F (providing that "[g]enerally, when an offender is convicted of multiple current offenses, . . . concurrent sentencing is presumptive"), VI (listing first-degree assault, but not possession of a firearm by an ineligible person, as an offense that is eligible for permissive consecutive sentencing) (2010). The district court therefore departed from the guidelines by sentencing Amick to a 60-month consecutive sentence for possession of a firearm by an ineligible person. *See* Minn. Sent. Guidelines II.F (stating that "use of consecutive sentences in any . . . case [in which consecutive sentencing is neither presumptive nor permissive] constitutes a departure"). Amick argues that the district court abused its discretion by imposing an upward-departure sentence in the form of consecutive sentencing.

"[Appellate courts] afford the trial court great discretion in the imposition of sentences and reverse sentencing decisions only for an abuse of that discretion." *State v. Soto*, 855 N.W.2d 303, 307–08 (Minn. 2014) (quotation omitted). But "a sentencing court can exercise its discretion to depart from the [sentencing] guidelines only if aggravating or mitigating circumstances are present, and those circumstances provide a substantial and compelling reason not to impose a guidelines sentence." *Id.* at 308 (quotations and citations omitted); *see also* Minn. Sent. Guidelines II.D (2010) (providing that "in exercising the discretion to depart from a presumptive sentence, the judge must disclose in writing or on the record the particular substantial and compelling circumstances that make the departure more appropriate than the presumptive sentence"). "[A]bsent a statement of the reasons for the sentencing departure placed on the record at the time of sentencing, no departure will be allowed." *State v. Geller*, 665 N.W.2d 514, 517 (Minn. 2003).

Here, the district court sentenced Amick to "60 months consecutive on the felon in possession of a gun," noting the circumstances surrounding Amick's commission of the first-degree assault and the fact that he was on probation and stating that "they're all very good reasons to do a *policy departure* on that." (Emphasis added.) The court apparently based its sentence on inaccurate information provided by the probation officer who completed the presentence-investigation report and by the prosecutor. The presentence-investigation report states that "the Court has the option to sentence the offenses consecutively without aggravating factors being present," claiming that an unidentified person at the Minnesota Sentencing Guidelines Commission said that "consecutive

15

sentences for presumptive prison commitment offenses are not governed by the Blakely ruling and are considered only a 'Policy Departure.'" And the prosecutor, in asking for consecutive sentencing, stated, "This is a *policy departure* from the guidelines, but I think there are plenty of reasons for the Court to do that in this case, and I will outline those." (Emphasis added.) The prosecutor then argued, without identifying a valid aggravating factor, "that [Amick] hasn't taken responsibility for this offense and that he is not amenable in any way to probation"; criticized Amick for providing "conflicting information in previous PSIs regarding his family history, his explanations for his truancy, his lack of success in school, his chemical abuse"; noted that Amick has "several prior incidents of assaultive behavior against other people" for which he was not convicted and that are not included in his "criminal record"; and noted that Amick had been unemployed for several years, drinks daily, "recently bingeing on weekends," and was not paying child support.

Even if the prosecutor had identified a valid aggravating factor and facts to support it, under the U.S. Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296, 303–04, 124 S. Ct. 2531, 2537 (2004), "other than a prior conviction, any fact that increases the sentence for a crime beyond the presumptive sentence established by the Minnesota Sentencing Guidelines for a particular crime must be submitted to the jury and proven beyond a reasonable doubt." *Vickla v. State*, 793 N.W.2d 265, 269 (Minn. 2011). *Blakely* requires a district court to "submit to a jury the question of whether the State has proven beyond a reasonable doubt the existence of additional facts, which were neither admitted by the defendant, nor necessary to prove the elements of the offense, but which

16

support reasons for departure." *State v. Rourke*, 773 N.W.2d 913, 921 (Minn. 2009). Amick did not waive his *Blakely* right to a jury determination of facts supporting an upward-departure sentence.

Because the district court did not identify any valid aggravating factors at the time of Amick's sentencing, the court abused its discretion by imposing an upward-departure sentence.[1] We conclude that the proper remedy is to reverse Amick's upward-departure sentence and remand for imposition of the presumptive sentence or, unless waived by Amick, the empanelling of a resentencing jury to determine the existence of facts in support of legitimate aggravating factors for upward-departure sentencing. *See State v. Jackson*, 749 N.W.2d 353, 358 (Minn. 2008) (ordering same remedy).

***Pro se claims***

Amick raises several additional claims in his pro se supplemental brief. He argues that the district court imposed excessive bail and abused its discretion by not instructing the jury on reckless discharge of a firearm. He also argues that he received ineffective assistance of counsel, that the state committed prosecutorial misconduct, and that the district court judge was biased against him. These claims are arguably waived for lack of briefing. *See State v. Wembley*, 712 N.W.2d 783, 795 (Minn. App. 2006) (stating that "assignment of error in a brief based on mere assertion and not supported by argument or authority is waived unless prejudicial error is obvious on mere inspection" (quotation

---

[1] The district court also erred in its calculation of the duration of Amick's sentence by using a criminal-history score of three for first-degree assault and a criminal-history score of five for possession of a firearm by an ineligible person. *See State v. Holmes*, 719 N.W.2d 904, 908 (Minn. 2006) ("If a consecutive sentence is permissive or a departure, a criminal history score of zero is assigned to determine the duration of the sentence.").

17

omitted)), *aff'd*, 728 N.W.2d 243 (Minn. 2007). We have nonetheless thoroughly reviewed Amick's claims and conclude that none presents a basis for relief. *See Ture v. State*, 681 N.W.2d 9, 20 (Minn. 2004) (rejecting pro se arguments without detailing consideration of each argument).

**Affirmed in part, reversed in part, and remanded.**