*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1539**

State of Minnesota,
Respondent,

vs.

Jesse Davis Holloman,
Appellant

**Filed August 17, 2015
Reversed
Ross, Judge**

Ramsey County District Court
File No. 62-CR-11-10084

Lori Swanson, Attorney General, St. Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Elizabeth Lamin, Assistant County Attorney, St. Paul, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Rachel F. Bond, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Ross, Presiding Judge; Cleary, Chief Judge; and Johnson, Judge.

## UNPUBLISHED OPINION

**ROSS**, Judge

The district court found Jesse Holloman guilty of reckless discharge of a firearm within a municipality after it determined that he possessed a loaded gun in a bedroom

across the hall from an in-home daycare and that this same gun fired and wounded a woman in the arm. Because the circumstances proved by the state do not rule out the reasonable possibility that the gun discharged as a result of an accidental or unintentional act, we reverse Holloman's conviction.

**FACTS**

Police received a call in the early afternoon of December 19, 2011, that a woman had been shot in the arm at a residence on Albemarle Street in St. Paul. The house served as both a residence and a daycare where the injured woman, M.A., was caring for three small children.

M.A. told police that she did not know who shot her or where the shot originated. Police found that the only other adult present during the shooting was Jesse Holloman, the homeowner's son. Police arrested Holloman, and the state charged him with reckless discharge of a firearm within a municipality and with two fifth-degree controlled-substance crimes. A jury found Holloman not guilty of the controlled-substance crimes and could not reach a verdict on the reckless-discharge count. Holloman waived his right to a jury for the retrial on that count and was tried before the district court in April 2014.

M.A. testified. She explained that the daycare was run out of a space in the basement, where there were also two bedrooms and a bathroom. She said that she knew that Holloman was in the southwest basement bedroom. At one point after she served lunch to the daycare children, M.A. entered the basement hallway to throw something away. She said she felt a "nudge" and heard a noise, but she could not determine what the noise was. She explained how she discovered that she had been shot: "And then I looked

2

at my arm, and my arm was messed up. And then I seen a hole in my arm where it was bleeding." M.A. recalled that the door to the bedroom where she had seen Holloman was closed.

M.A. was shot in the arm just above her left elbow. She sat on the steps and called her husband. She testified that she saw Holloman while she was sitting and that she thought Holloman called for emergency help. The recording of the emergency call confirmed that Holloman did make the call.

The state introduced overwhelming evidence that the gunshot originated inside the house. St. Paul Police Sergeant Kenneth Jensen testified that he investigated the shooting. He said that Holloman had asserted that the bullet entered the home through a window in the southwest basement bedroom. But the sergeant found that, although the window was broken, the screen covering the window had no hole, and glass from the broken window was lying outside rather than inside. Officer Michael Polski testified that when he arrived he noticed that Holloman's hand was bleeding. Holloman had told him that he cut himself on the broken window where the bullet supposedly entered, but, like Sergeant Jensen, Officer Polski testified that he found no hole in the screen. St. Paul crime lab sergeant Shay Shackle testified that he determined the bullet's trajectory based on a bullet hole in the bedroom door. It had certainly not passed from the outside through the bedroom window. Sergeant Shackle concluded instead that the "approximate origination point of the firearm . . . would have been on the -- near the floor by the box spring and the mattress" in the bedroom.

Although police did not find the gun that shot Adams, video footage apparently explains why. The home's surveillance camera recorded Holloman going to the garage with a backpack near the time of the shooting. The footage shows that, about five minutes later, Holloman retrieved the backpack and gave it to the driver of a van that appeared in front of the house. Holloman reentered the home without the backpack just before police arrived.

Holloman testified in his defense. He offered a version of events that had him in the southwest basement bedroom waiting for a ride to the hospital to visit his brother. He claimed that he went to the garage with items he intended to return to the person who was coming to drive him to the hospital. He said that he then went upstairs to a different bedroom and got dressed to leave. He told the court that, while he was dressing, he heard "one, maybe two shots" and then heard M.A. scream. He found M.A. in the basement with the daycare children, saw that she had been shot, and dialed 9-1-1. Holloman testified that the driver arrived to pick him up, at which point Holloman went outside and told him what had happened. According to Holloman, the driver wanted his possessions, so Holloman directed him to the garage to retrieve them.

Holloman denied handling any gun that day. He testified that the bullet hole in the door to the southwest basement bedroom was from a previous shooting one or two years prior to M.A.'s shooting. He acknowledged that he knew that M.A. was a substitute daycare provider that day and that children were in the basement.

Based on this evidence, the district court found Holloman guilty of reckless discharge of a firearm within a municipality. It did not believe Holloman's claim to have

4

been upstairs when the shot occurred. It found that he was instead in the southwest basement bedroom and that the firearm was discharged inside that room. The court further found that, after the shooting, Holloman took the gun to the garage. It found that the discharge was reckless based on the following reasoning:

> Defendant knew that the southwest bedroom was across the hall from a room where day care was operating, caring for small children who were present. Defendant also knew [M.A.] was present at the day care across the hallway.
>
> Defendant's actions in connection with the discharge of the firearm in the southwest bedroom of the home were reckless in that they created a substantial and unjustifiable risk that Defendant was aware of and disregarded.

Holloman appeals his conviction.

## DECISION

Holloman argues that his conviction cannot stand because the state did not prove that he acted recklessly in discharging the firearm. Holloman's conviction rests on circumstantial evidence. We assess the sufficiency of circumstantial evidence supporting a conviction in two stages. We first identify the circumstances proved, "defer[ring] to the fact-finder's acceptance of the proof of these circumstances," and rejecting evidence contrary to the circumstances proved. *State v. Hokanson*, 821 N.W.2d 340, 354 (Minn. 2012), *cert. denied*, 133 S. Ct. 1741 (2013). We next independently examine "the reasonableness of all inferences that might be drawn from the circumstances proved," including any inferences that support hypotheses other than guilt. *State v. Andersen*, 784 N.W.2d 320, 329 (Minn. 2010) (quotation omitted). We will affirm the conviction only if

the circumstances proved are consistent with guilt and inconsistent with any other rational hypothesis. *State v. Fairbanks*, 842 N.W.2d 297, 307 (Minn. 2014).

The legislature has criminalized the reckless discharge of a firearm within a municipality. Minn. Stat. § 609.66, subd. 1a(a)(3) (2014). To act recklessly within the meaning of the statute, a person must create a "substantial and unjustifiable risk" that he is aware of and disregards. *State v. Engle*, 743 N.W.2d 592, 595 (Minn. 2008). The accused does not need to intend to discharge a firearm to be convicted of this crime, but he must commit "a conscious or intentional act in connection with the discharge of a firearm that creates a substantial and unjustifiable risk that he is aware of and disregards." *Id*. at 596. In other words, the statute criminalizes intentional acts "that increase the likelihood that the gun will discharge accidentally, involuntarily, or reflexively." *Id*.

The circumstances proved, as found by the district court, are that Holloman discharged the gun in the southwest bedroom "from a location on or just off the bed." It also found that Holloman knew "that the southwest bedroom was across the hall from a room where a day care was operating" and that M.A. was caring for the daycare children. And the court determined that, after the discharge, Holloman moved the gun from the bedroom to the garage. Again, the court concluded that Holloman's actions "were reckless in that they created a substantial and unjustifiable risk that Defendant was aware of and disregarded." Its memorandum explained how it concluded that Holloman had participated somehow in the gun's discharge: "Guns simply do not load themselves and discharge without human intervention. [Holloman] created a substantial and unjustifiable risk with the loaded firearm in proximity to M.A. and an operating day care where

6

[Holloman] knew children were present." Based on this reasoning, the district court found that Holloman's act of possessing a loaded gun near daycare children satisfied the statutory *mens rea* requirement, and it therefore convicted him of reckless discharge.

The district court's reasoning that Holloman was involved in the gun's discharge is faultless. But neither the district court's reasoning nor the circumstances proved at trial rule out the possibility that the "human intervention" that precipitated the discharge was something less than reckless conduct. Given that a conviction requires proof that Holloman engaged in a "conscious or intentional act in connection with the discharge" that "increase[d] the likelihood that the gun [would] discharge accidentally, involuntarily, or reflexively," *Engle*, 743 N.W.2d at 596, we will affirm if the circumstantial evidence would allow only for such a finding. But the district court did not make any finding as to what Holloman was doing with the gun when it discharged, or how he was doing it, and the record does not allow for anything other than speculation as to what that conduct might have been.

The district court seems to say that Holloman's merely possessing or handling the loaded gun inside the occupied daycare is sufficient to establish recklessness. The state does not support that theory with any legal authority. And as a matter of law, we know that loaded guns can indeed be possessed where people are present. *See* Minn. Stat. § 624.714, subds. 1(a) (permitting a person to carry a pistol in public with a permit), 9(1) (allowing a person to carry a pistol in his dwelling or place of business without a permit) (2014). Obviously, intentionally discharging a firearm without reason inside the occupied house would have been reckless, as would intentionally twirling it around, or engaging in

a host of other foolish conduct. But again, the district court made no findings as to any act, let alone an intentional or reckless act by Holloman, and the only basis for its decision—the gun's mere close proximity to people—does not by itself constitute reckless behavior, even if those people are children or those caring for them.

Given the lack of any finding or evidence about what Holloman was doing with the gun when it discharged, a reasonable fact finder cannot rule out the possibility that the gun was fired by accident rather than in connection with a "conscious or intentional act" that made it more likely that the gun would discharge. It is true that Holloman's moving the gun from the bedroom to the garage and ultimately out of the house after the discharge implies a guilty conscience. But negligent or accidental conduct could reasonably precipitate the same guilt-based concealment and deceit, and this is conduct that the district court's findings and reasoning do not exclude.

Because the district court's findings and rationale allow for a reasonable, innocent hypothesis, we hold that the circumstantial evidence presented at trial cannot support Holloman's conviction. Holloman cites alleged constitutional trial errors in a pro se supplemental brief. Our holding renders those alleged errors irrelevant, and we do not consider them.

**Reversed.**

8